1  RICHARD J. PETERSEN, SBN# 41012
   PATRICIA LITTLEFIELD, SBN# 132686
2  444 North School Street
   Ukiah, California  95482
3  Telephone:    (707) 468-5184
   Fax:          (707) 462-0472
4  Email:        p.littlefield@earthlink.net

5  Attorneys for Petitioner
   Florencio Torres Rodriguez
6

7

8             UNITED STATES DISTRICT COURT

9         FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 FLORENCIO TORRES RODRIGUEZ,                C 07 4796

12        Petitioner,                          No. _____ WHA

13
   v.
14
                                             PETITION FOR WRIT OF HABEAS
15 RICHARD SUBIO,                            CORPUS BY A PERSON IN STATE
                                             CUSTODY (28 U.S.C. § 2254)
16        Warden, Mule Creek State Prison,
          Respondent.
17

18

19

20

21

22

23

24

25

26

27

28

                            1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TOPICAL INDEX

Page #

TABLE OF AUTHORITIES...................................................................................... ii

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE
CUSTODY .................................................................................................................. 1

INTRODUCTION ....................................................................................................... 1

   I.   HISTORY OF PRIOR PROCEEDINGS ......................................................... 2

   II.  FACTS OF THE OFFENSES. ........................................................................ 4

   III. GROUNDS SUPPORTING THE PETITION FOR RELIEF........................ 12

FIRST GROUND FOR RELIEF............................................................................... 13

          TRIAL OF COUNTS 3 AND 4 IN SANTA CLARA COUNTY, WHEN
          THEY OCCURRED IN LAKE COUNTY, VIOLATED RODRÍGUEZ'S
          FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS. ..................... 13

                Background Facts........................................................................... 13

SECOND GROUND FOR RELIEF .......................................................................... 15

          THE CONVICTION FOR COUNT FOUR IS NOT SUPPORTED BY
          SUFFICIENT EVIDENCE, IN VIOLATION OF DUE PROCESS. ................... 15

THIRD GROUND FOR RELIEF .............................................................................. 15

          INEFFECTIVE ASSISTANCE OF NEW TRIAL COUNSEL RESULTED
          IN THE TRIAL COURT'S REFUSAL TO RELEASE PHONE RECORDS
          CRITICAL TO RODRIGUEZ'S DEFENSE AND HIS NEW TRIAL
          MOTION. ......................................................................................................... 15

                Background Facts........................................................................... 15

PRAYER FOR RELIEF ............................................................................................ 17

VERIFICATION ....................................................................................................... 18

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS ..................................................... 19

   I.       STANDARD FOR GRANTING THE WRIT. ........................................... 19

   III     THE CONVICTIONS IN COUNTS THREE AND FOUR VIOLATE
         FEDERAL DUE PROCESS. ................................................................... 22

   III     THE CONVICTION IN COUNT FO3UR VIOLATES DUE
         PROCESS IN THAT IT IS UNSUPPORTED BY SUFFICIENT
         EVIDENCE. ........................................................................................... 27

   IV.    RODRIGUEZ RECEIVED INEFFECTIVE ASSISTANCE OF
         COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT. .............. 29

CONCLUSION ......................................................................................................... 30

i

Petition for Writ of Habeas Corpus

*Rodriguez  v. Subia*

No. _____

# TABLE OF AUTHORITIES

**Federal Cases**

*Bennett v. Mueller,*
    322 F.3d 573 (9th Cir. 2003) ................................................................. 24

*Brinkerhoff-Faris Co. v. Hill,*
    281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107 (1930) ................................ 23

*Bruce v. Terhune,*
    376 F.3d 950 (9th Cir. 2004) ................................................................. 28

*Chein v. Shumsky,*
    373 F.3d 978 (9th Cir. 2004) ................................................................. 28

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) .............................................................................. 19

*Coleman v. Thompson,*
    501 U.S. 722, 111 S.Ct. 2546 (1991) ................................................... 24

*Davis v. Woodford,*
    333 F.3d 982 (9th Cir. 2003) ................................................................. 20

*Ellard v. Alabama Board of Pardons and Paroles,*
    824 F.2d 937 (11th Cir. 1987) ......................................................... 22, 23

*Ford v. Georgia,*
    498 U.S. 411, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) ........................ 24

*Green v. White,*
    232 F.3d 671 (9th Cir. 2000) ................................................................. 20

*Hamm v. Latessa,*
    72 F.3d 947 (1st Cir. 1995) ................................................................... 22

*Hicks v. Oklahoma,*
    447 U.S. 343 (1980) .............................................................................. 22

*Hurtado v. Tucker,*
    245 F.3d 7 (1st Cir. 2001) ..................................................................... 27

ii

*In re Winship,*
    397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ............................ 27

*Irons v. Carey,*
    408 F.3d 1165 (9th Cir. 2005) ...................................................... 19

*Irons v. Carey,*
    479 F.3d 658 (9th Cir. 2007) ...................................................... 19

*Irons v. Carey,*
    __ F.3d __, 2007 WL 2027359 (July 13, 2007) ........................ 19

*Jackson v. Virginia,*
    443 U.S. 307 (1979) ...................................................... 27

*Jeffries v. Wood,*
    114 F.3d 1484 (9th Cir. 1997) ...................................................... 21

*Juan H. v. Allen,*
    408 F.3d 1262 (9th Cir. 2005) ...................................................... 27

*Knapp v. Cardwell,*
    667 F.2d 1253 (9th Cir. 1982) ...................................................... 23

*Lambert v. Blodgett,*
    393 F.3d 943 (9th Cir. 2004) .......................................... 20, 21, 22

*Lockyer v. Andrade,*
    538 U.S. 63 (2003) ...................................................... 20

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ...................................................... 19

*Morales v. Calderon,*
    85 F.3d 1387 (9th Cir. 1996) ...................................................... 24

*Mullaney v. Wilbur,*
    421 U.S. 684 (1975) ...................................................... 23

*Murdock v. City of Memphis,*
    20 Wall. 590, 22 L.Ed. 429 (1875) ...................................................... 22

iii

*Noltie v. Peterson,*
     9 F.3d 802 (9th Cir. 1993)................................................................ 24

*Oxborrow v. Eikenberry,*
     877 F.2d 1395 (9th Cir. 1989)......................................................... 23

*Park v. California,*
     202 F.3d 1146 (9th Cir. 2000)......................................................... 24

*Piaskowski v. Bett,*
     256 F.3d 687 (7th Cir. 2001)........................................................... 27

*Poland v. Stewart,*
     169 F.3d 573 (9th Cir. 1999)........................................................... 24

*Ponnapula v. Spitzer,*
     297 F.3d 172 (2d Cir. 2002)............................................................ 27

*Radio Station WOW, Inc. v. Johnson,*
     326 U.S. 120, 65 S.Ct. 1475, 89 L.Ed. 2092 (1945).................... 23

*Roper v. Simmons,*
     543 U.S. 551 (2005)......................................................................... 29

*Rupe v. Wood,*
     93 F.3d 1434 (9th Cir. 1997)........................................................... 21

*Sanford v. Yukins,*
     288 F.3d 855 (6th Cir. 2002)........................................................... 27

*Sarausad v. Porter,*
     479 F.3d 671 (9th Cir. 2007)........................................................... 28

*Smith v. Mitchell,*
     437 F.3d 884 (9th Cir. 2006)........................................................... 27

*Strickland v. Washington,*
     466 U.S. 668 (1984)......................................................................... 29

*Taylor v. Maddox,*
     366 F.3d 992 (9th Cir. 2004)................................................. 20, 21

iv

*Terre Haute & I.R. Co. v. Indiana ex rel. Ketcham,*
    194 U.S. 579, 24 S.Ct. 767, 48 L.Ed. 1124 (1904) ............................................ 23

*United States v. Bautista-Avila,*
    6 F.3d 1360 (9th Cir. 1993) ............................................................................ 28

*United States v. Lewis,*
    787 F.2d 1318 (9th Cir. 1986) ........................................................................ 28

*United States v. Lewis,*
    798 F.2d 1250 (9th Cir. 1986) ........................................................................ 28

*Walters v. Maass,*
    45 F.3d 1355 (9th Cir. 1995) .......................................................................... 28

*Ward v. Love County,*
    253 U.S. 17, 40 S.Ct. 419, 64 L.Ed. 751 (1921) ............................................ 23

*White v. Lambert,*
    370 F.3d 1002 (9th Cir. 2004) ........................................................................ 19

*Williams v. Taylor,*
    529 U.S. 362 (2000) ........................................................................................ 20

*Winters v. New York,*
    333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948) .......................................... 22

*Wood v. Hall,*
    130 F.3d 373 (9th Cir. 1997) .......................................................................... 24

*Woodford v. Visciotti,*
    537 U.S. 19 (2002) .......................................................................................... 20

*Wright v. West,*
    505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) ................................ 28

State Cases

*Cowan v. Superior Court,*
    14 Cal.4th 367 (1996) ..................................................................................... 26

v

*Rodriguez v. Subia*
No. _____

*People v. Betts*,
    34 Cal.4th 1039 (2005).................................................................... 14, 25

*People v. Price*,
    25 Cal. 4th 1046 (2001).......................................................................... 14

*People v. Simon*,
    25 Cal.4th 1082 (2001).......................................................................... 25

*People v. Williams*,
    77 Cal.App.4th 436 (1997)..................................................................... 26

United States Constitution

    Fifth Amendment .......................................................................... 12, 15
    Sixth Amendment .......................................................................... 12, 29
    Fourteenth Amendment ............................................................ 12, 13, 15

United States Statutes

    28 U.S.C. § 2253 .................................................................................. 2
    28 U.S.C. § 2254 .................................................................. 1, 2, 4, 19
    28 U.S.C. § 2254 (d) ......................................................................... 20
    28 U.S.C. § 2254 (d)(1) ........................................................ 19, 21, 22
    28 U.S.C. § 2254 (d)(2) .............................................................. 20, 21
    28 U.S.C. § 2254 (e)(1) .............................................................. 20, 21

California Statutes

    Penal Code § 273.55.............................................................................. 2
        § 288 (a)............................................................................ 1, 2
        § 288 (a)(8).......................................................................... 1, 2
        § 667.5 (b) ............................................................................... 2
        § 784.7 ........................................................ 3, 13, 14, 23, 24, 25, 26
        § 784.7 (a)............................................................................... 14
        § 954 ..................................................................................... 13
        § 1203.066 (a)(8)...................................................................... 2

vi

1   RICHARD J. PETERSEN, SBN# 41012
    PATRICIA LITTLEFIELD, SBN# 132686
2   444 North School Street
    Ukiah, California  95482
3   Telephone:    (707) 468-5184
    Fax:          (707) 462-0472
4   Email:        p.littlefield@earthlink.net

5   Attorneys for Petitioner
    Florencio Torres Rodriguez
6

7

8                   UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  FLORENCIO TORRES RODRIGUEZ,

12          Petitioner,

13                                              No. _____

14      v.

15  RICHARD SUBIO,                              **PETITION FOR WRIT OF HABEAS
                                                CORPUS BY A PERSON IN STATE
16          Warden, Mule Creek State Prison,    CUSTODY (28 U.S.C. § 2254)**
            Respondent.
17

18

19                        <u>INTRODUCTION</u>

20      1. Petitioner  Florencio Torres Rodriguez ("Rodriguez"), is confined by

21  Respondent Richard Subia at Mule Creek State Prison, Ione, California, under California

22  Department of Corrections number V-44470.  Rodriguez's confinement is based on a

23  judgment imposing a prison sentence of ten years, composed of the midterm of six years

24  on count 1, a concurrent six year sentence on count two, and consecutive terms of two

25  years each on counts 3 and 4, following his convictions of four counts of lewd and

26  lascivious acts on a child under 14, and true findings on the special allegations as

27  charged, violations of California Penal Code sections 288, subdivision (a), and 288,

28

                                        1

1  subdivision (a)(8), respectively.[1] Rodriguez files this verified petition for writ of habeas

2  corpus through his counsel and pursuant to 28 U.S.C. section 2254 — with jurisdiction

3  under 28 U.S.C. § 2253 — on the ground that he is held in the custody of Respondent in

4  violation of the constitution and laws of the United States.

5        2.  Rodriguez has modified the Court's standard form for habeas corpus petitions

6  while providing all of the information required to be set forth by that standard form. The

7  first section provides a procedural history of the case which supplies the case information

8  required by the standard form. The second section presents evidence of the offense heard

9  by the jury. The third section contains Rodriguez's claims for relief and supporting

10  allegations of fact, if different from the facts of the offense. The fourth section contains

11  Rodriguez's prayer for relief. A verification and memorandum of points and authorities

12  follow.

13               **I. HISTORY OF PRIOR PROCEEDINGS**[2]

14        On September 5, 2003[3], the district attorney of Santa Clara County filed an

15  information charging Rodriquez in counts 1 through 4 with lewd and lascivious conduct

16  with Maile Doe, a child under 14, violations of section 288, subdivision (a), with special

17  allegations under section 288, subdivision (a)(8) as to counts 2 and 3 that Rodriguez had

18  substantial sexual conduct with M. Doe within the meaning of section 1203.066,

19  subdivision (a)(8). The prosecutor also alleged that Rodriguez had suffered a prior prison

20  term for a conviction in Santa Clara County Superior Court Case No. 184269, for

21  corporal injury of a spouse in violation of section 273.55, within the meaning of section

22  667.5 (b). Counts 1 and 2 were alleged to have taken place between July 1, 2000, and

23  _____

24  [1] All further statutory references are to the California Penal Code unless otherwise noted.

25  [2] The History of Prior Proceedings and the Factual Background of the Offense are taken
    from either Rodriguez's Opening Brief on Appeal, which contains citations to the record

26  on appeal, and/or the decision of the Sixth District California Court of Appeal, No.
    H027959, filed April 17, 2006, affirming the convictions.

27
    [3] The initial information was filed on September 5, 2003. It was amended numerous

28  times without objection until its final version as set forth here.

2

1  December 31, 2000, in Santa Clara County.  Counts 3 and 4 were alleged to have taken
2  place between December 1, 2000 and June 30, 2001, in Lake County.
3         Rodriguez pleaded not guilty to all charges, and on February 5, 2004, jury trial
4  began with the testimony of the first witness.[4]  Rodriquez was represented at trial by
5  Wesley Schroeder, Esq.
6         After one day of deliberations the jury on February 18, 2004, reached verdicts of
7  guilty on all counts as charged, and found the special allegations to be true
8         On April 6 2004, new counsel associated in and on May 11, 2004, trial counsel
9  was relieved and new counsel substituted for sentencing and other proceedings   New
10  counsel was Richard J. Petersen, SBN 42013, Petersen & Petersen, 444 North School
11  Street, Ukiah, CA.  95482, who continued to represent Rodriguez on appeal and in filing
12  a petition for review in the California Supreme Court.
13        Rodriguez filed a motion for new trial primarily on the grounds that he received
14  ineffective assistance of counsel at trial.  The court denied the motion and on July 20,
15  2004, sentenced Rodriguez to ten years in state prison as follows:  midterm of six years
16  on count 1, a concurrent six year sentence on count two, and consecutive terms of two
17  years each on counts 3 and 4.  The prosecution dismissed the prior prison term allegation.
18        Rodriguez timely filed a notice of appeal on September 16, 2004.  The judgment
19  was appealed to the California Court of Appeal, Sixth Appellate District, No. H027959,
20  and affirmed in all respects on April 17, 2006.  *See* copy of Court of Appeal decision
21  appended hereto as Exhibit A.
22        The grounds raised on appeal were:  1) convictions on counts three and four must
23  be dismissed because their trial in an improper venue based on an arbitrary application of
24  section 784.7 to Rodriguez violated his right to federal due process; 2) count four violates
25  due process because it is not supported by sufficient evidence; 3) counsel's
26
27
   _____
28  [4]  Rodriguez waived jury trial on the prior prison term allegation.

3

1  ineffectiveness led to the trial court's refusal to release phone records during proceedings
2  on Rodriguez's motion for new trial.

3       Rodriguez filed a Petition for Review in the California Supreme Court, No.
4  S143741, which was denied on June 28, 2006. *See* copy of Supreme Court order denying
5  the petition, appended hereto as Exhibit B.

6       The grounds raised in the petition for review were the same as those raised in
7  Court of Appeal No. H143741. Rodriguez has no sentence to serve other than the one he
8  challenges here.

9       Rodriguez currently has no petitions pending in any court, state or federal,
10  challenging the conviction here at issue. He has previously filed no petition in federal
11  court challenging the conviction here at issue. This petition is timely under 28 U.S.C.
12  § 2254, and the Antiterrorism and Effective Death Penalty Act ("AEDPA"), and all of the
13  issues raised herein have been presented to the highest court in the State of California.
14

15              **II. FACTS OF THE OFFENSES.**

16       Until approximately mid-to-late December 2000 Rodriguez, his wife Melanie
17  Fountain, Melanie's daughter Maile from a previous relationship — then ten —, and
18  Melanie and Rodriguez's son, Samuel — then six or seven — , lived in Santa Clara
19  County. During that period they lived in a two story apartment on La Pala Drive in San
20  Jose. Rodriguez had a then-ten year-old daughter, Gabrielle, by a previous marriage who
21  regularly visited them on La Pala Drive and often stayed overnight. Rodriguez also had a
22  son Frank Jr., then-around twelve or thirteen, who would visit and stay overnight at
23  Rodriguez's on La Pala with Gabrielle. This occurred just about every weekend. When
24  Gabrielle and Frank Jr. stayed overnight, Gabrielle shared Maile's upstairs bedroom with
25  her. Frank Jr. slept on the couch in the living room downstairs. The television was there
26  and Frank Jr. watched television a great deal of the time when he visited and stayed at the
27  apartment on La Pala Drive.
28

4

1   Rodriguez and Melanie had a roller-coaster marriage. They fought and Melanie

2   would throw Rodriguez out. He would be gone overnight, for days, or a couple of weeks.

3   Melanie would often call the police on Rodriguez, knowing he was on probation or

4   parole. Rodriguez was afraid that Melanie would call the police to get him in trouble.

5   During their marriage Rodriguez suffered two misdemeanors convictions for inflicting

6   corporal injury on a cohabitant and a felony conviction for inflicting corporal injury

7   resulting in a traumatic condition on a spouse. He was also convicted of misdemeanor

8   cohabitant abuse against another woman in Sonoma County in 2002. Between 1989 and

9   1996, Melanie suffered two misdemeanor convictions for petty theft, one for petty theft

10  with a prior, and one for embezzlement and false report. Rodriguez was drinking alcohol

11  on a daily basis and abusing substances in the last few months of 2000, and could not

12  remember certain things from that time period.

13      While living on La Pala, Maile testified that around Halloween to Christmas of

14  2000, she and Gabrielle had made themselves beds on the floor of the living room,

15  watched TV late or into the morning, and were sleeping there. She thought this occurred

16  on a weekend, and believed her brother was upstairs playing and her mother had gone to

17  the grocery store.[5]

18      At some point Maile saw Rodriguez lying on the couch, about ten feet from the

19  bed on the floor, and got on the couch with him. She testified that, after being there, she

20  noticed her bottom clothing was partly down and felt Rodriguez's penis on the outside

21  and inside of her vagina; nasty wet stuff came out. Rodriguez also put his mouth on her

22  bare breasts. She felt very uncomfortable and pretended to fall off the couch to get away,

23  before which she heard Rodriguez mumble, "let's go upstairs." She went over to

24  Gabrielle on the floor, who was asleep; woke her; and told her that Rodriguez had just

25  touched her in a bad way. Maile testified she stayed with Gabrielle after that, and did not

---

[5]  The front door to the house opened so that one saw straight into the living room, to the couch, and that was the only way in and out of the apartment.

5

1  recall telling Lucero or Zanotto that when Rodriguez took her clothes off she got up, went

2  into the bathroom, and waited for her mother to come home.

3       Gabrielle testified she had never slept on the living room floor with Maile, and

4  Maile had never awakened Gabrielle there to tell her that Rodriguez had touched her.[6]

5  Gabrielle testified that Maile did tell her that "Dad's touching me," but the conversation

6  occurred in Maile's bedroom.  Gabrielle took that to mean that Rodriguez was touching

7  Maile in a sexual way.  Gabrielle asked if Maile wanted Gabrielle to tell Maile's mom,

8  but Maile said, "no," that she would tell her.  In a statement to Lucero, Gabrielle said that

9  Maile first told Gabrielle that when Rodriguez had been drinking he would touch her.

10      Maile's telling Gabrielle of the touching probably occurred before, although

11  Gabrielle was not certain, a time when Gabrielle saw Rodriguez come out of the

12  bathroom, and Maile come out of the bedroom; and the two met in the upstairs hallway.

13  They stood close and whispered to each other.  Gabrielle thought they expressed surprise

14  when she spoke to them, and Gabrielle thought it strange that Maile would be so close

15  and familiar with Rodriguez when Maile had just told Gabrielle the day before about the

16  "bad touching."

17      Before Rodriguez, Melanie, Maile and Samuel moved together to Kelseyville in

18  Lake County around Christmas of 2000, Maile believes she told her mother in vague

19  terms that Rodriguez had touched Maile in a way that made her feel uncomfortable.

20  Maile recalled this in the interview of November 2002 with Lucero, although she had not

21  mentioned it in earlier interview[s].  Maile believed that she had told her mother that

22  Rodriguez touched her when Rodriguez got out of the car to go into the bank after all

23  three of them drove to the bank.

24      Melanie testified that she was at work one day in late 2000 talking to Maile on the

25  phone, when Maile told Melanie that Rodriguez had tried or attempted to touch Maile in

26

27  _____

28  [6]  Frank Jr. had indicated that he always slept on the living room couch when he and
     Gabrielle visited Rodriguez in the apartment on La Pala Drive.

6

1    an uncomfortable way. Maile did not give details and Melanie did not press her for any.

2    Melanie testified she immediately called Rodriguez on the phone and confronted him.

3    She then went home to be with Maile, and she and Rodriguez arrived there at the same

4    time; Rodriguez tried to talk to Melanie about it but she did not want to hear it. Maile

5    could not remember any such occurrence. Rodriguez testified that Melanie had never

6    told him of Maile's allegation.

7         No report of this allegation was made to authorities or to anyone else in 2000 or

8    2001. Maile continued to spend time with Rodriguez and to be affectionate with him

9    until June of 2001 when Melanie moved back to San Jose with Maile and Samuel, and

10   Rodriguez remained in Kelseyville.

11        In mid-to-late December of 2000 the whole family moved in with Rodriguez's

12   parents, Marianne and Carlos Lara, in Kelseyville in Lake County. While there

13   Rodriguez and Melanie joined a local church, attended regularly, and were involved in

14   various other activities connected with the church. Both Melanie and Rodriguez worked

15   with youth at the church. Rodriguez discussed with the minister there his past problems

16   with drugs and alcohol, but did not reveal his prior convictions for spousal battery or that

17   he was on parole.

18        Rodriguez testified that the family moved to Kelseyville so that he would not work

19   so much and so that he would get away from the friends he had there and the substance

20   and alcohol abuse. Rodriguez said he was successful in doing that after his move to

21   Kelseyville. Rodriguez admitted that it was a violation of his parole to move to

22   Kelseyville from San Jose without the permission of his parole officer, and that he did not

23   work in Lake County because the parole agent might discover the violation if he saw

24   work records. Rodriguez admitted violating probation and parole many times, telling lies

25   to cover it up, telling the police officers who interviewed him about some of his dishonest

26   acts, and even lying under oath. He said he knew when he committed acts of domestic

27   abuse that they were wrong; he had continued to do it because he did not have control

28   over his emotions and anger until he began taking medication.

7

1    Maile testified that one night when the family was living in Kelseyville she,
2 Rodriguez and Samuel were on air-mattress beds in a big tent that was set up on the deck
3 of the house there.  They would sometimes go out there and pretend they were camping.
4 Rodriguez and Maile were on a big air mattress and Samuel was on a separate one.  The
5 tent probably did not have solid walls all the way around, but consisted of screen.  It was
6 located right outside the bedroom windows of Rodriguez's parents.
7    Maile testified that she was sleeping next to Rodriguez when something touched
8 her mouth and woke her up.  Maile "thought" it was his penis.  It felt like a fly landed on
9 her, tickled, and she "swished it off" with her hand.  She said nothing to Rodriguez at that
10 point and did not look at him, but scooted over.  She testified that Rodriguez also put his
11 penis on and in her vagina, the same as in San Jose.  Maile testified that it did not last
12 long because she rolled away from Rodriguez, over to where Samuel lay sleeping, where
13 she remained.  She did not leave the tent or tell anyone then what happened.
14    A little after Mother's Day in 2001, Melanie moved in with her aunt in Lucerne,
15 Lake County, about an hour's drive away from Kelseyville.  There was conflicting
16 testimony from Melanie, Maile, Samuel, and Rodriguez, whether Melanie took Maile and
17 Samuel with her to live at her aunt's house, or whether Melanie and Rodriguez — who
18 was still living in Kelseyville with his parents — alternated caring for Maile and Samuel
19 in Kelseyville and Lucerne.  Maile spent time with Rodriguez after Melanie moved to
20 Lucerne, either when others were around and also alone.
21    Maile testified that she had told a friend of hers, Shantyana, after the move back to
22 San Jose in June of 2001, that Rodriguez had touched her in a sexual way.  Maile told
23 Shantyana about this because Shantyana had a similar problem and she trusted her.
24 Shantyana testified that Maile told Shantyana that Rodriguez touched her, which
25 Shantyana took to mean "hit her."  Shantyana testified that Maile did not say anything
26 about sexual or bad touching by Rodriguez, Maile just said he touched her.  Shantyana
27 also testified that Maile had said something about Rodriguez saying he would kidnap her
28

8

1   because he did not have visitation rights, but Maile testified she had said no such thing to
2   Shantyana.

3           Melanie testified that on July 21, 2002, she and Maile were watching a news
4   report on TV of a girl in California who had been kidnapped, sexually abused, and
5   murdered. Melanie testified that Maile became very emotional, and again talked about
6   Rodriguez's sexual abuse of her. Melanie decided to call the police. Rodriguez testified
7   that Melanie had called him about not wanting to testify in a domestic violence case of
8   Rodriguez's in Sonoma County in 2002. Rodriguez was having Melanie subpoenaed, she
9   did not want to come, and tried to persuade him to take a plea bargain so she would not
10  have to appear. When Rodriguez indicated he would not comply, Melanie threatened
11  him, saying "Watch what I'll do." This conversation occurred between December of
12  2001 and March of 2002.

13          A patrol officer, Zanotto, came to Maile's house on July 21, 2002, and interviewed
14  Maile. According to his report and memory, Maile was crying and did not want to talk to
15  him. She told Zanotto that she and Gabrielle were sleeping together on a fold-out sofa in
16  the living room in Kelseyville, that Rodriguez molested her, and she stood up and moved
17  behind Gabrielle to avoid Rodriguez. She said Rodriguez then fell off the couch. Maile
18  told Zanotto the molest in San Jose occurred in her bed. Maile also told Zanotto that
19  when Rodriguez touched her she went into the bathroom and waited for her mother to
20  come home.

21          On July 25, 2002, Detective Lucero called Melanie to make an appointment to
22  interview Maile, preferably at a child center used for that purpose, or at home if need be.
23  He called Melanie again on August 7, 2002, when he had not heard back from her; an
24  appointment was scheduled for such interview on August 14, 2002, at Maile's house at
25  6:30 p.m. For some reason that Lucero could not recall that interview did not take place.
26  Despite Lucero's subsequent attempts to reschedule an interview, it did not take place
27  until November 19, 2002, when Lucero undertook of his own accord to go to Maile's
28  school to interview her there because he could not seem to get an interview arranged

9

Petition for Writ of Habeas Corpus

*Rodriguez v. Subia*

No. _____

1    through Melanie.  Lucero acknowledged that Melanie appeared not to be cooperating in
2    the investigation.  Melanie, in palpably defensive testimony even from the dry record,
3    portrayed herself as having tried to arrange an interview between Maile and Lucero but
4    for various reasons, including playing "phone tag," could not.  She was evasive and
5    "could not remember" many events during questions regarding the four months between
6    the reporting on July 21, 2002, and Lucero's first interview of Maile on November 19,
7    2002.  Despite the fact that Maile told Melanie in December of 2000 that Rodriguez had
8    sexually touched Maile, Melanie did not report it until July of 2002, and did not even
9    assure that Rodriguez did not have the opportunity again by keeping Maile away from
10   him until June of 2001.

11          Officer Lucero had been trained in interviewing victims of alleged child
12   molestation.  At the November 19, 2002, tape-recorded interview Maile gave Lucero,
13   after corrections and clarifications, essentially the same description of the acts
14   constituting the molestation charges against Rodriguez that she testified to at trial.

15          Lucero admitted that, when interviewing an alleged victim of child molestation he
16   generally adheres to the general principle that children do not lie about such things.  He
17   also admitted that he generally does not confront a child with inconsistencies within the
18   child's own statements, or between the child's statements and those of other witnesses
19   that are conflicting.  Lucero also conceded that in interviewing Maile, several times he
20   had asked leading or suggestive questions.  Lucero did not know why, in this case, he did
21   not ask Maile about inconsistencies in her own statements about what had happened with
22   Rodriguez, and inconsistencies between her statements and those of others.

23          During the period between the family's arrival in Kelseyville and the return of
24   Melanie, Maile, and Samuel to San Jose around June 8, 2001, Melanie recalled that Maile
25   had two or three times again brought up the subject that Rodriguez had touched Maile
26   sexually.  Maile remembered perhaps telling her mother about it one or two other times
27   than the time in San Jose before the family moved to Kelseyville, but Maile was not
28

10

1    certain. Melanie recalled that Maile told Melanie about the sexual touching once in the
2    car, once in a residence, and once at school, but could remember no other details.

3         On November 21, 2002, Lucero interviewed Melanie and scheduled Maile for a
4    sexual abuse physical exam. The first one was scheduled for November 25, 2002, but
5    Melanie did not bring Maile. The second was scheduled for November 27, and again
6    Melanie did not bring Maile. The exam finally took place on December 2, 2002.

7         The exam revealed no physical evidence that Maile had been molested or suffered
8    a penetration of the vagina. The examining expert testified that 82% of girls who have
9    had penile penetration exhibit physical manifestations of such even a year or two later,
10   and 18% do not. The expert was not surprised to find no evidence of penetration or
11   sexual molestation with Maile because she was in pre-puberty by the time of the
12   examination. Many changes occur between the ages of ten and thirteen that can obscure
13   any physical indication of penetration or molestation in a girl. The expert indicated that
14   the lack of such evidence did not mean that Maile had not been molested.

15        After the physical exam, Lucero contacted Melanie several times to try and set up
16   a pretext phone call[2] to Rodriguez. Lucero did not recall Melanie saying Rodriguez
17   would know, if they made such a call, that they were up to something so that he would
18   not admit anything. No pretext call was ever made because Melanie set and then broke
19   appointments, claiming personal reasons prevented it.

20        An expert in Child Sexual Abuse Accommodation Syndrome (CSAAS), employed
21   by the prosecutor's office, testified that he had not reviewed any of the materials in this
22   case or interviewed any of those involved, and knew nothing about it. The purpose of his
23   testimony was to explain certain types of behavior that child molest victims can exhibit
24   that probably would not make sense to an adult, or that an adult would interpret to mean
25   that the child had not been molested despite the child's report of such an event. These

26   _____

27   [2]  Melanie or Maile would call Rodriguez as if on their own and try to get incriminating
     statements from him about the molest allegations while the call was being taped by the
28   police, unbeknownst to Rodriguez.

11

1  types of behavior are: Secrecy; Helplessness; Entrapment and Accommodation; Delayed,

2  Conflicting, Unconvincing Disclosure; and Retraction.

3      Secrecy occurs because sexual abuse of children is usually only between the adult

4  and the child, and the adult reinforces the need for secrecy. Helplessness manifests

5  because children are immature and do not have the same sense of getting help or fixing a

6  problem that adults do. Entrapment and accommodation reflect that the child must get

7  along day-to-day in a family situation where a family member is the molester, so they

8  adapt, or act out. There are disclosure problems because child molest victims rarely

9  disclose at or near the time of the sexual abuse. The disclosure then usually comes in bits

10  and pieces which are often conflicting, and at times such as during an argument when a

11  child is less likely to be believed. Finally, children who disclose sexual abuse often

12  retract or take back the allegations because of the chaos and pressure that results. A

13  conclusion that a child has, or has not, been molested cannot be arrived at based on a

14  pattern of CSAAS in a child.

15

16  ## III. GROUNDS SUPPORTING THE PETITION FOR RELIEF

17      Rodriguez's confinement is illegal because his conviction and judgment were

18  secured by the State of California in violation of his rights guaranteed by the Fifth, Sixth,

19  and Fourteenth Amendments to the United States Constitution. As set forth more fully

20  herein, Rodriguez's convictions and sentence violated his rights to due process, the

21  opportunity to present a defense, and his right to the effective assistance of counsel. The

22  following facts support his claims, among others to be presented after completion of an

23  adequately funded investigation, access to adequate discovery and subpoena power, and

24  an evidentiary hearing. Rodriguez also incorporates by reference into each of his claims

25  the allegations set forth in the preceding sections of this petition.

26

27

28

12

1

## FIRST GROUND FOR RELIEF

2
3

TRIAL OF COUNTS 3 AND 4 IN SANTA CLARA COUNTY, WHEN THEY OCCURRED IN LAKE COUNTY, VIOLATED RODRÍGUEZ'S FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS.

4      Rodriguez's confinement and judgment are illegal and contravene rights

5  guaranteed by the Fourteenth Amendment to the Constitution because he was tried in a

6  county other than where the offenses occurred, and the state courts arbitrarily deprived

7  him of his rights under section 784.7.

8      Background Facts.

9      Rodriguez was tried in Santa Clara County on two counts of lewd and lascivious

10 behavior that occurred in Santa Clara County in late 2000, and two counts of lewd and

11 lascivious behavior that occurred between December 1, 2000, and June 30, 2001 in Lake

12 County. Although not complied with in a fundamental aspect, the trial of the Lake

13 County charges in Santa Clara County apparently occurred pursuant to section 784.7.

14      Section 784.7 provides in relevant part:

15
16
17
18
19
20
21
> (a) When more than one violation of Section 220, except assault with intent to commit mayhem, 261, 262, 264.1, 269, 286, 288, 288a, 288.5, or 289 occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing pursuant to Section 953, within the jurisdiction of the proposed trial. At the Section 954 hearing, the prosecution shall present evidence in writing that all district attorneys in counties with jurisdiction of the offenses agree to the venue. Charged offenses from jurisdictions where there is no written agreement from the district attorney shall be returned to that jurisdiction.

22      The record is devoid of any evidence that the Lake County District Attorney

23 agreed in writing to trial of the Lake County charges in Santa Clara County. There was

24 no section 954 hearing, or any other hearing, proceeding or documents where the

25 prosecutor in Santa Clara County presented evidence in writing that the district attorney

26 of Lake County agreed to Santa Clara County as the venue for the Lake County charges.

27      As set forth above, section 784.7 provides that "charged offenses from

28 jurisdictions where there is no written agreement from the district attorney *shall* be

13

1  returned to that jurisdiction." And, where the prosecutor, as here, "*shall* present evidence

2  in writing that" (§ 784.7, subd. (a)) the Lake County District Attorney agreed to Santa

3  Clara County as the venue, but did not, trial of the Lake County charges in Santa Clara

4  County was impermissible.

5      The purpose of section 784.7, as originally enacted, was to relieve victims of

6  certain types of offenses that occurred in more than one county in the state, such as child

7  molestation or stalking, of having to repeatedly testify. *People v. Price,* 25 Cal.4th 1046,

8  1055 (2001). Such provision would also save money because only one trial, rather than

9  several, would be required. *Id.* When section 784.7 initially became law, it omitted the

10  requirements that the prosecutor of a county in which an offense took place must agree in

11  writing to trial of that offense in another county when the other requirements of section

12  784.7 had been met.

13      In 2002, the Legislature amended section 784.7 to (1) eliminate the requirement

14  that all offenses involve the same defendant and the same victim and (2) provide specific

15  procedures for consolidating charges from different counties, which require written

16  agreement of the district attorney of each county. *People v. Betts,* 34 Cal.4th 1039, 1058,

17  inc. n.14 (2005); *see* Stats. 2002, ch. 194, § 2. The 2002 amendment added a number of

18  specific requirements for the trial in another county of an offense that occurred elsewhere

19  where no such procedures existed before, and twice used the word "shall" to direct these

20  procedures. The Legislature in amending the statute also mandated jurisdiction of an

21  offense where that county's prosecutor did not agree in writing to its trial in another

22  county, to reside only in the county where the offense occurred. The legislative intent is

23  plain: in Rodriguez's case jurisdiction to try the Lake County charges existed only in

24  Lake County.

25      The Sixth District Court of Appeal rejected Rodriguez's claim on the basis that he

26  failed to object before trial to the lack of the Lake County prosecutor's written agreement

27  to trial of counts 3 and 4 in Santa Clara County.

28

14

1             <u>SECOND GROUND FOR RELIEF</u>

2   THE CONVICTION FOR COUNT FOUR IS NOT SUPPORTED BY
SUFFICIENT EVIDENCE, IN VIOLATION OF DUE PROCESS.
3

4       Rodriguez's confinement and judgment are illegal and contravene rights

5 guaranteed by the Fifth and Fourteenth Amendments to the Constitution because the

6 conviction on count four is not supported by sufficient evidence, depriving him of due

7 process. The facts supporting this ground for relief are set forth in the second section,

8 *ante*.

9             <u>THIRD GROUND FOR RELIEF</u>

10   INEFFECTIVE ASSISTANCE OF NEW TRIAL COUNSEL RESULTED
IN THE TRIAL COURT'S REFUSAL TO RELEASE PHONE RECORDS
11   CRITICAL TO RODRIGUEZ'S DEFENSE AND HIS NEW TRIAL
MOTION.
12

13    <u>Background Facts</u>.

14       Before trial, Rodriguez requested phone records from phones which Melanie

15 Fountain used. Based on the subsequent record of trial these records were sought for the

16 purpose of confirming Rodriguez's assertions that Melanie had often contacted

17 Rodriguez during times when she said she had not contacted him; to show that she

18 contacted him frequently in the time leading up to July 21, 2002, the date when she called

19 the police to report that Maile had been sexually abused by Rodriguez between June of

20 2000 and June of 2001; and to show that she was not afraid of Rodriguez as she had

21 reported to Detective Lucero. The court granted that request and these phone records

22 were released to Rodriguez. The phone records supplied were for the wrong time periods

23 and so were useless. Trial counsel did not correct that mistake.

24       In the proceedings on the motion for new trial, Rodriguez's new attorney

25 requested that the phone records covering the correct time period be released to

26 Rodriguez. In particular, this was to show that Melanie Fountain had called Rodriguez

27 many times in the months leading up to her reporting Maile's statements to the police.

28 This time period is crucial because Rodriguez remarried on July 22, 2002, the day after

Petition for Writ of Habeas Corpus                 *Rodriguez v. Subia*
                                          No. _____

1   Melanie reported Maile's statements to police. Melanie knew that Rodriguez was
2   remarrying on July 22 and did not want it to happen.

3           The trial court denied new trial counsel's request to release the correct phone
4   records to Rodriguez. The court believed that Melanie Fountain had been extensively
5   impeached during trial; incorrectly believed that evidence of Rodriguez's marriage on
6   July 22 had been presented to the jury, and with other evidence before the jury of
7   Melanie Fountain's potential vindictiveness, evidence of phone calls — even if frequent
8   — from her to Rodriguez would have added nothing to her impeachment or to reasons
9   that Maile may have made false or exaggerated statements regarding Rodriguez's sexual
10  touching of her.

11          The trial court denied Rodriguez's request partly on the mistaken basis that the
12  jury heard testimony that Melanie Fountain reported Rodriguez to the police the day after
13  he remarried, culminating the period during which the phone records would have shown
14  that Melanie repeatedly called Rodriguez; and on the bases that the requested phone
15  records would have supplied only cumulative impeachment evidence and that such would
16  not have changed the result at trial. The court of appeal did not mention or address
17  Rodriguez's claim that his counsel was ineffective for failing to adequately present the
18  parameters of the request to the trial court, and for failing to correct the trial court's
19  mistaken belief that the jury heard evidence that Melanie reported Rodriguez to the police
20  the day after he remarried. New trial counsel's failure to correct the trial court's
21  misunderstanding was critical and constituted deficient performance. New trial counsel's
22  failed to articulate the fact the evidence was not cumulative because it would have
23  supplied an objective basis upon which to disbelieve Melanie Fountain, a basis that was
24  not the result simply of "he said, she said." This also constituted deficient performance
25  that prejudiced Rodriguez.

26          ///
27          ///
28          ///

16

1

<u>PRAYER FOR RELIEF</u>

2      WHEREFORE, Rodriguez prays that this Court:

3      1.  Issue a writ of habeas corpus to have Rodriguez brought before the Court to the

4  end that he might be discharged from his unconstitutional confinement and restraint and

5  relieved of his unconstitutional conviction and judgment;

6      2.  Conduct a hearing at which proof may be offered concerning the allegations in

7  this petition.

8      3.  Make such orders as are necessary for Rodriguez to fully and fairly challenge

9  the judgment rendered by the state court, and provide him with appropriate means to

10  develop the facts supporting his claims, including access to discovery, an adequately

11  funded investigation, provision of fees for necessary experts, and provide authority for

12  Rodriguez to obtain subpoenas without fee for witnesses and documents necessary to

13  prove the facts alleged in this petition.

14      4.  Grant such other and further relief as may be appropriate.

15      DATED:  September 17, 2007

16

17                          RICHARD J. PETERSEN

18                          Attorney for Petitioner

19

20

21

22

23

24

25

26

27

28

17

1

<u>VERIFICATION</u>

2       I, Richard Petersen, declare under penalty of perjury under the laws of the United

3   States:

4       I am an attorney admitted to practice before the courts of the State of California

5   and the United States District Court for the Northern District of California.  My office

6   address is:  444 North School Street, Ukiah, California 95482.  I am the attorney retained

7   to represent Rodriguez in this proceeding.

8       I am authorized by Rodriguez to file this petition for writ of habeas corpus on his

9   behalf.  Rodriguez is confined and restrained of his liberty at Mule Creek State Prison,

10  Ione, California, and my office is in Ukiah in Mendocino County.  I make this

11  verification on Rodriguez's behalf because the allegations herein are a matter of record

12  and are as much within my knowledge as his.

13      I declare that the contents of this petition are true.

14      Executed this 17th day of September, 2007, at Ukiah, Mendocino County,

15  California.

16

17

18  RICHARD J. PETERSEN

19

20

21

22

23

24

25

26

27

28

18

1
2

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION
## FOR WRIT OF HABEAS CORPUS

3

I.

4

## STANDARD FOR GRANTING THE WRIT.

5

6      The AEDPA as currently interpreted applies to Rodriguez's case. *See, inter alia,*
7   28 U.S.C. § 2254; *White v. Lambert,* 370 F.3d 1002, 1008-1010 (9th Cir. 2004).
8   Rodriguez proceeds as if the AEDPA applies, without conceding the constitutionality of
9   its provisions. *See Irons v. Carey,* 408 F.3d 1165 (9th Cir. 2005), requesting
10  supplemental briefing on whether "in light of *Marbury v. Madison,* 5 U.S. (1 Cranch) 137
11  (1803), and *City of Boerne v. Flores,* 521 U.S. 507, 536 (1997), ... [the] AEDPA
12  unconstitutionally prescribes the sources of law that the Judicial Branch must use in
13  exercising its jurisdiction or unconstitutionally prescribes the substantive rules of
14  decision by which the federal courts must decide constitutional questions that arise in
15  state habeas cases.  The parties should consider whether, under the separation of powers
16  doctrine or for any other reason involving the constitutionality of 28 U.S.C. § 2254
17  (d)(1), this court should decline to apply the AEDPA standards in this case."  Two of
18  three jurists in *Irons v. Carey,* 479 F.3d 658 (9th Cir. 2007), mod. July 13, 2007, ___ F.3d
19  ___, 2007 WL 2027359, have questioned the constitutionality of the provision in 28
20  U.S.C. § 2254 that "prescribes the substantive rules of decision" by which the federal
21  courts decide constitutional questions in state habeas cases, and have urged the High
22  Court to address it.
23      Under the AEDPA, a federal court can only grant relief in a state prisoner's habeas
24  corpus proceeding when the adjudication of the claim by the state court "resulted in a
25  decision that was contrary to, or involved an unreasonable application of, clearly
26  established Federal law, as determined by the Supreme Court of the United States" (28
27  U.S.C. § 2254 (d)(1)) or "resulted in a decision that was based on an unreasonable
28  determination of the facts in light of the evidence presented in the State Court

19

1    proceeding." To show that the state court unreasonably applied federal law, a petitioner

2    must demonstrate "that the state court's application of Supreme Court precedent to the

3    facts of his case was not only incorrect but 'objectively unreasonable.'" *Davis v.*

4    *Woodford*, 333 F.3d 982, 990 (9th Cir. 2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19,

5    25 (2002)); *see also Williams v. Taylor*, 529 U.S. 362, 409 (2000) (O'Connor, J.,

6    concurring). An unreasonable error is one in excess of even a reviewing court's

7    perception that "clear error" has occurred. *Lockyer v. Andrade*, 538 U.S. 63, 75-76

8    (2003). A state court ruling that resulted in a decision that was based on an unreasonable

9    determination of the facts in light of the evidence presented in the State Court proceeding

10   is one that is "clearly incorrect." *Green v. White*, 232 F.3d 671, 672 incl. n.3 (9th Cir.

11   2000).

12        Federal habeas challenges to purely factual questions determined by the state

13   courts are reviewed under 28 U.S.C. section 2254 (d)(2); "[t]he question on review is

14   whether an appellate panel, applying the normal standards of appellate review, could

15   reasonably conclude that the finding is supported by the record. Thus, under the

16   AEDPA, state court factual determinations are presumed correct in the absence of clear

17   and convincing evidence to the contrary. In addition, state court decisions which are

18   adjudicated on the merits and based on factual determinations will not be overturned on

19   habeas review under AEDPA unless the decisions were objectively unreasonable in light

20   of the evidence presented in the state court proceedings. *Lockyer v. Andrade,* 538 U.S. at

21   75.

22        The Ninth Circuit Court of Appeals recently interpreted 28 U.S.C. sections 2254

23   (d) and 2254 (e)(1), and held both provisions apply to challenges supported by separate

24   categories of evidence. *Taylor v. Maddox,* 366 F.3d 992, 1000 (9th Cir. 2004); *Lambert*

25   *v. Blodgett,* 393 F.3d 943, 971-973 (9th Cir. 2004) ("*Lambert*"). In *Taylor v. Maddox,*

26   the Ninth Circuit held that the "unreasonable determination" clause of 28 U.S.C. section

27   2254 (d)(2) applies to intrinsic review of a state court's process, i.e., circumstances in

28   which a petitioner challenges the state court's findings based entirely on the state court

20

*Rodriguez v. Subia*

No. _____

1  record. *Taylor v. Maddox*, 366 F.3d at 999-1000. The Ninth Circuit also held that

2  28 U.S.C. § 2254 (e)(1) applies to challenges based on extrinsic evidence, i.e., evidence

3  presented for the first time in federal court. *Id.* As explained in *Taylor:* "[I]t is not

4  enough that we would reverse in similar circumstances if this were an appeal from a

5  district court decision; rather, we must be convinced that an appellate panel, applying the

6  normal standards of appellate review, could not reasonably conclude that the finding is

7  supported by the record." *Id.* (citations omitted). Likewise, mere doubt as to the

8  adequacy of the state court's findings of fact is insufficient; "we must be satisfied that any

9  appellate court to whom the defect [in the state court's fact-finding process] is pointed out

10  would be unreasonable in holding that the state court's fact-finding process was adequate.

11  *Id.; Lambert v. Blodgett*, 393 F.3d at 972.

12      A mixed question of law and fact is one that requires the application of legal

13  principles to historical and other facts.  28 U.S.C. section 2254 (e)(1)'s presumption of

14  correctness is restricted to pure questions of historical fact. *Lambert*, 393 F.3d at 976.

15  However, "[s]tate decisions applying law to facts are governed by 28 U.S.C. section 2254

16  (d)(1); however, factual findings underlying the state court's conclusions on the mixed

17  issue are accorded a presumption of correctness." *Id., citing Jeffries v. Wood*, 114 F.3d

18  1484, 1498 (9th Cir. 1997) (AEDPA "further restricts the scope of federal review of

19  mixed questions of law and fact. De novo review is no longer appropriate; deference to

20  the state court factual findings is."), *further citing Rupe v. Wood*, 93 F.3d 1434, 1444 (9th

21  Cir. 1997) (voluntariness of confession is a legal question not entitled to presumption of

22  correctness but the state court's finding that no threats or promises were made was

23  "essentially a factual conclusion, which is entitled to a presumption of correctness").

24      A federal court reviewing a state court decision based on a mixed question of law

25  and fact must "first separate the legal conclusions from the factual determinations that

26  underlies it. Fact-finding underlying the state court's decision is accorded the full

27  deference of 28 U.S.C. sections 2254 (d)(2) and (e)(1), while the state court's conclusion

28  as to the ultimate legal issue - or the application of federal law to the factual findings - is

*Rodriguez  v. Subia*
                                                                              No. _____

1    reviewed per 28 U.S.C. section 2254 (d)(1) in order to ascertain whether the decision is

2    'contrary to, or involved an unreasonable application of, clearly established' Supreme

3    Court precedent." *Lambert*, 393 F.3d at 977-978.

4            Here, the state court decisions denying Rodriguez relief were contrary to or

5    involved an unreasonable application of clearly established Federal law as determined by

6    the Supreme Court of the United States, and also resulted in a decision that was based on

7    an unreasonable determination of the facts in light of the evidence presented in the State

8    Court proceedings. Accordingly, the writ should be granted.

9

10                                          III

11   THE CONVICTIONS IN COUNTS THREE AND FOUR VIOLATE
     FEDERAL DUE PROCESS.

12

13           The arbitrary application of a state court law that impacts liberty implicates the

14   due process clause of the United States Constitution. In certain circumstances federal

15   courts are not bound by state court constructions of their own laws. *See, e.g., Murdock v.*

16   *City of Memphis*, 20 Wall. 590, 22 L.Ed. 429 (1875), *Winters v. New York*, 333 U.S. 507,

17   68 S.Ct. 665, 92 L.Ed. 840 (1948). For example, both the Ninth Circuit and the United

18   States Supreme Court have recognized that a state court's construction of its own law can

19   itself violate federal due process. *Ellard v. Alabama Bd. of Pardons and Paroles*, 824

20   F.2d 937, 944 n.7 (11th Cir. 1987), *cert denied*, 485 U.S. 981 (1988); *Hicks v. Oklahoma*,

21   447 U.S. 343 (1980) (a state court's decision arbitrarily depriving a person of a state

22   statute affecting life or liberty constitutes a violation of federal due process); *Hamm v.*

23   *Latessa*, 72 F.3d 947, 954 (1st Cir. 2001). "The question of whether a state law creates a

24   liberty interest protected by federal due process is clearly one of federal constitutional

25   law[.]" *Id.* "The rule, then, is that a federal habeas court will not disturb the state court's

26   construction or application of state law unless it can be shown that such construction or

27   application offends the Constitution or some (applicable) federal statute. [Citations

28   (explaining that a state's interest in fashioning its own rules of state law is paramount to

                                            22

Petition for Writ of Habeas Corpus                                    *Rodriguez v. Subia*
                                                              No. _____

1  any federal interest *except* protecting individuals from state action that is wholly arbitrary

2  and irrational)]." *Id.*, italics in original.

3      Where a state appellate court's decision is "so inconsistent with [a] statute's

4  language and history that the state court decision itself comprises a wholly arbitrary and

5  irrational action, it violates federal due process." *Ellard v. Alabama Bd. of Pardons and*

6  *Paroles*, 824 F.2d at 944 n.7.  In *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir.

7  1989) the Ninth Circuit held that, although a state court must be recognized as the

8  ultimate expositor of its own state law, deference is "suspended … upon a finding that the

9  court's interpretation is untenable or amounts to a subterfuge to avoid federal review of a

10  constitutional violation," citing *Knapp v. Cardwell*, 667 F.2d 1253, 1260 (9th Cir. 1982).

11      In *Mullaney v. Wilbur*, 421 U.S. 684 (1975), the United States Supreme Court

12  discussed two other exceptions to the general principle that state courts are the ultimate

13  arbiters of their own laws and their interpretations are generally paramount.  The first

14  occurred when a state court's reinterpretation of a criminal statute was "so novel as to be

15  'unforeseeable' and therefore deprived the defendants of fair notice of the possible

16  criminality of their acts at the time they were committed.  Thus, the retroactive

17  application of the new interpretation was itself a denial of due process. See also

18  *Brinkerhoff-Faris Co. v. Hill*, 281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107 (1930)." *Id.* at

19  690 n.10.  Second, on "rare occasions the [United States Supreme] Court has re-examined

20  a state-court interpretation of state law when it appears to be an 'obvious subterfuge to

21  evade consideration of a federal issue.' *Radio Station WOW, Inc. v. Johnson*, 326 U.S.

22  120, 129, 65 S.Ct. 1475, 1480, 89 L.Ed. 2092 (1945). See *Ward v. Love County*, 253

23  U.S. 17, 40 S.Ct. 419, 64 L.Ed. 751 (1921); *Terre Haute & I.R. Co. v. Indiana ex rel.*

24  *Ketcham*, 194 U.S. 579, 24 S.Ct. 767, 48 L.Ed. 1124 (1904)." *Id.* at 691 n.11.

25      Here, the state court affirmed an arbitrary application of section 784.7, permitting

26  it to be applied to Rodriguez when its explicit and mandatory provisions, designed for the

27  benefit of the District Attorney from the county where two of the offenses were alleged to

28  have occurred but were not being tried, had not been complied with.  That statute

1  conferred jurisdiction for the trial of counts 3 and 4 only on Lake County, unless the Lake

2  County district attorney agreed in writing that trial of those counts could occur in another

3  county. No permission, written or otherwise, was obtained by the prosecutor to try

4  counts 3 and 4 in Santa Clara County. Rodriguez has been deprived by the State of

5  California of four years of his liberty due to this arbitrary application of section 784.7.

6      The state courts sidestepped the arbitrary deprivation of Rodriguez's state

7  statutory, and thus federal constitutional due process rights, by holding his claims were

8  barred for failure to object to those violations prior to trial. This failure to object cannot,

9  however, preclude Rodriguez from raising this claim in federal court.

10      For the procedural default rule to apply ... the application of
11      the state procedural rule must provide ' an adequate and
        independent state law basis' on which the state court can deny
12      relief." *Park v. California*, 202 F.3d 1146, 1151 (9th Cir.
        2000) (quoting *Coleman [v. Thompson]*, 501 U.S. [722] at
13      729-30, 111 S.Ct. 2546 [1991]). If the court finds an
        independent and adequate state procedural ground, "federal
14      habeas review is barred unless the prisoner can demonstrate
        cause for the procedural default and actual prejudice, or
15      demonstrate that the failure to consider the claims will result
        in a fundamental miscarriage of justice." *Noltie v. Peterson*,
16      9 F.3d 802, 804-05 (9th Cir. 1993); *Coleman*, 501 U.S. at
        750, 111 S.Ct. 2546; *Park*, 202 F.3d at 1150.

17  *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).

18      To be deemed adequate, the state law ground for decision
19      must be well-established and consistently applied. *Poland v.
        Stewart*, 169 F.3d 573, 577 (9th Cir. 1999) ( " A state
20      procedural rule constitutes an adequate bar to federal court
        review if it was ' firmly established and regularly followed'
21      at the time it was applied by the state court." ) (quoting *Ford
        v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d
22      935 (1991)). Although a state court's exercise of judicial
        discretion will not necessarily render a rule inadequate to
23      support a state decision, *Wood v. Hall*, 130 F.3d 373, 376 (9th
        Cir. 1997), to be considered adequate, the discretion must
24      entail " ' the exercise of judgment according to standards
        that, at least over time, can become known and understood
25      within reasonable operating limits.' " *Id.* at 377 (quoting
        *Morales [v. Calderon]*, 85 F.3d [1387] at 1392 [(9th Cir.
26      1996)]). State rules that are too inconsistently or arbitrarily
        applied to bar federal review " generally fall into two
27      categories: (1) rules that have been selectively applied to bar
        the claims of certain litigants ... and (2) rules that are so
28      unsettled due to ambiguous or changing state authority that
        applying them to bar a litigant's claim is unfair." *Id.*

*Id.* at 583.

24

1    Here, the requirement that Rodriguez object to the failure of the Santa Clara

2 County District Attorney to obtain the written permission of the Lake County District

3 Attorney to try counts three and four in Santa Clara County is not adequate to preclude

4 federal court review.   The court of appeal, when it invoked Rodriguez's failure to object

5 as the basis to reject his claim, cited a California Supreme Court case from 2001, *People*

6 *v. Simon*, 25 Cal.4th 1082, 1104, n.15 (2001).  *Simon* held that "the issue of venue in

7 criminal as well as in civil cases does *not* involve a question of 'fundamental' or 'subject

8 matter' jurisdiction over a proceeding." (*Id.* at 1096.)  As a result, and for other reasons

9 set forth in *Simon*, California's High Court held generally that a defendant's failure to

10 object to venue at trial constitutes a waiver or forfeiture of that issue. (*Id.* at 1103-1104,

11 1107-1108.)

12    *Simon*, however, did not involve a situation as here in section 784.7 where an

13 affirmative, mandatory duty — undisputed by the State or the state courts — lay with the

14 Santa Clara County District Attorney to obtain written permission from the Lake County

15 District Attorney, and enter this permission in the record, in order to try the Lake County

16 charges in Santa Clara County with those charges.  This requirement of section 784.7 is a

17 legislative requirement intended to confer a right upon the District Attorney of the county

18 in which the offense occurred to *prevent* trial of that offense in another county if the

19 District Attorney in the county of offense concluded that trial in his or her own county, or

20 another outcome altogether, would best serve prosecutorial and community interests.

21    At the time *Simon* was decided, section 784.7 did not contain the requirement for

22 written prosecutorial permission.  *Simon*, 25 Cal.4th at p. 1095, fn. 6; *People v. Betts*, 34

23 Cal.4th 1039, 1058, inc. n.14 (2005); see Stats. 2002, ch. 194, § 2.  Section 784.7 was

24 amended in 2002 to add that requirement, indicating that district attorneys in counties

25 where section 784.7-qualifying offenses had been committed objected to the ability of the

26 prosecutor in another county to summarily, of their own accord, move the prosecution of

27 an offense from the county where it was committed to a different one.

28

25

1   Rodriguez was not required to object to the action of the trial court in excess of its

2   jurisdiction in order to raise this issue on appeal. *See, e.g., Cowan v. Superior Court,* 14

3   Cal.4th 367, 374 (1996) ("*Cowan*") (court may act in excess of jurisdiction in accepting a

4   guilty plea to a time-barred lesser offense). Trial on those counts exceeded the Santa

5   Clara County Court's jurisdiction absent the express, written permission of the Lake

6   County prosecutor whose interest section 784.7 intended to protect by requiring that

7   permission.

8   A second exception to the waiver rule is that it "is generally not applied when the

9   alleged error involves a pure question of law, which can be resolved on appeal without

10  reference to a record developed below." *People v. Williams*, 77 Cal.App.4th 436, 460

11  (1997).

12  > We acknowledge that the objection/waiver rule is generally
13  > not applied when the alleged error involves a pure question of
    > law, which can be resolved on appeal without reference to a
    > record developed below. [Citation.] Conversely, when the
14  > alleged error involves the exercise of trial court's discretion
    > based on factual findings and the particular circumstances of
15  > a case, the waiver rule is applied because it serves an essential
    > function: It encourages the parties to present all relevant
16  > evidence so the court can resolve factual disputes upon which
    > the ruling must be based, and permits the court to develop a
17  > complete record for review. [Citation.]

18  The question in Rodriguez's case was purely legal: Whether the Santa Clara

19  County court acted in excess of its jurisdiction by presiding over trial of the Lake County

20  charges — ostensibly under section 784.7 — when the express, written permission of the

21  Lake County prosecutor was not obtained although mandated by section 784.7. These

22  circumstances and exceptions demonstrate that a contemporaneous objection by

23  Rodriguez in this situation is not well-established and consistently applied.

24  ///

25  ///

26  ///

27

28

26

III

THE CONVICTION IN COUNT FO3UR VIOLATES DUE PROCESS IN THAT IT IS UNSUPPORTED BY SUFFICIENT EVIDENCE.

Under clearly established Supreme Court case law, due process requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia,* 443 U.S. 307, 316 (1979) (explaining *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Under the AEDPA federal courts ascertain whether a state court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of *Jackson. See Juan H. v. Allen,* 408 F.3d 1262, 1274 (9th Cir. 2005) (as amended); *see also Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir. 2002); *Sanford v. Yukins,* 288 F.3d 855, 863 (6th Cir. 2002); *Piaskowski v. Bett,* 256 F.3d 687, 691 (7th Cir. 2001); *Hurtado v. Tucker,* 245 F.3d 7, 16 (1st Cir. 2001); *see also Smith v. Mitchell,* 437 F.3d 884, 889 (9th Cir. 2006) ("Our task under AEDPA ... is to determine whether the decision of the [state court], holding that the evidence was sufficient to convict[the defendant], was an unreasonable application of *Jackson.*").

This circuit has found certain guidelines useful in applying the objectively unreasonable test to a state court decision applying *Jackson.* These guidelines are:

> (1) The focus of the inquiry is on the state court decision;
>
> (2) Even with the deference due by statute to the state court's determinations, the federal habeas court must look to the "totality of the evidence" in evaluating the state court's decision;
>
> (3) The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;
>
> (4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and

27

1              (5) The absence of cases of conviction precisely parallel on
           their facts does not, by itself, establish objective
2              unreasonableness.

3   *Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir. 2007).

4        In performing a *Jackson* analysis, "'[c]ircumstantial evidence and inferences

5   drawn from [the record] may be sufficient to sustain a conviction.'" *Walters v. Maass,*

6   45 F.3d 1355, 1358 (9th Cir. 1995) (quoting *United States v. Lewis,* 787 F.2d 1318, 1323

7   (9th Cir. 1986), *amended by* 798 F.2d 1250 (9th Cir. 1986)). However, "'mere suspicion

8   or speculation cannot be the basis for creation of logical inferences.'" *Id.* (quoting *Lewis,*

9   787 F.2d at 1323). Where behavior is consistent with both guilt and innocence, the

10  burden is on the State to produce evidence that would allow a rational trier of fact to

11  conclude beyond a reasonable doubt that the behavior was consistent with guilt. *United*

12  *States v. Bautista-Avila,* 6 F.3d 1360, 1363 (9th Cir. 1993). However, "the prosecution

13  need not affirmatively 'rule out every hypothesis except that of guilt[.]'" *Wright v. West,*

14  505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (citation omitted). A jury's

15  credibility determinations are "entitled to near-total deference under *Jackson*." *Bruce v.*

16  *Terhune,* 376 F.3d 950, 957 (9th Cir. 2004). The *Jackson* standard "must be applied with

17  explicit reference to the substantive elements of the criminal offense as defined by state

18  law." *Chein v. Shumsky,* 373 F.3d 978, 983 (9th Cir. 2004) (en banc) (internal quotation

19  marks omitted).

20       Here, the court denied Rodriguez's claim that count four is not supported by

21  sufficient evidence, by reciting the investigator's statement from Maile that indicates the

22  incident in count four did not occur in Lake County, or in the time period charged.

23  During that interview with the investigating officer, not only was Maile not under oath,

24  she was participating in a conversation with an authority figure. He admitted during his

25  testimony that: … when interviewing an alleged victim of child molestation he generally

26  adheres to the general principle that children do not lie about such things. He also

27  admitted that he generally does not confront a child with inconsistencies within the

28  child's own statements, or between the child's statements and those of other witnesses

28

1  that are conflicting.  He also conceded that in interviewing Maile, several times he had

2  asked leading or suggestive questions.  He did not know why, in this case, he did not ask

3  Maile about inconsistencies in her own statements about what had happened with

4  Rodriguez, and inconsistencies between her statements and those of others.

5       In *Roper v. Simmons*, 543 U.S. 551, 559-560 (2005), the United States Supreme

6  Court described the nature of children and teenagers thusly:

> A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions. ... [¶] ... J]uveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. [Citation.] ... '[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage....This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment.' ... [¶] ... The reality [is] that juveniles still struggle to define their identity....

15      Maile's description in her trial testimony that the object that touched her lips felt

16  like a fly that tickled, and she "swished" it off with her hand, also is inconsistent with a

17  penis touching her lips.  In light of the record of the case in its entirety, and the

18  requirement that evidence of each element of the offense must be substantial, the

19  evidence is insufficient to support the conviction in count four.

20

21                              IV.

22  RODRIGUEZ RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL
    IN VIOLATION OF THE SIXTH AMENDMENT.
23

24      Where counsel's performance was deficient and such has prejudiced the defense, a

25  defendant is deprived of the effective assistance of counsel.  *Strickland v. Washington*,

26  466 U.S. 668, 687 (1984).  In this case, trial counsel's deficient performance resulted in

27  the refusal of the trial court to release phone records crucial to the defense's attempt to

28  obtain a new trial for Rodriguez.  The state courts failed to address this claim of

                              29

1   Rodriguez's. The factual finding of the trial court that the jury heard evidence that

2   Melanie Fountain reported Rodriguez the day after he remarried, a basis it used in

3   denying Rodriguez's request as cumulative, was patently incorrect as no such evidence

4   existed in the trial record.  The trial court's conclusion that such impeachment would

5   only have been cumulative, and that it would not have changed the outcome, are also

6   unreasonable. The phone records constituted direct objective evidence showing that

7   Melanie was lying under oath, whereas the remaining impeachment referred to by the

8   trial court was of the nonobjective "he said, she said," nature. That and other

9   nonobjective impeachment of Melanie Fountain is subject to interpretation, whereas the

10   objective impeachment was not.

## CONCLUSION

13      For the foregoing reasons the Court should grant Rodriguez's writ and order him

14   released forthwith.

15      DATED:  September 17, 2007

16                      Respectfully Submitted,

19                      RICHARD J. PETERSEN

20                      Attorney for Petitioner
Florencio Torres Rodriguez

30

*Rodriguez v. Subia*
No. _____

# EXHIBIT A

COPY

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

THE PEOPLE,

    Plaintiff and Respondent,

    v.

FLORENCIO TORRES RODRIGUEZ,

    Defendant and Appellant.

H027959

(Santa Clara County
Super. Ct. No. CC306742)



Court of Appeal - Sixth App. Dist.

F I L E D

APR 1 7 2006

MICHAEL J. YERLY, Clerk

By _____
             DEPUTY

    Defendant Florencio Torres Rodriguez was convicted after jury trial of four counts of lewd conduct on a child under 14 (Pen. Code, § 288, subd. (a)).[1] He was sentenced to 10 years in state prison. On appeal he contends that the convictions on two counts must be reversed and dismissed because they were improperly tried in Santa Clara County. He further contends that there is insufficient evidence to support the conviction on one of those counts, and that the trial court erred in denying his request to release subpoenaed phone records during the proceedings on his motion for new trial. We disagree with all of defendant's contentions, and therefore affirm.

BACKGROUND

    Defendant was charged by second amended information with four counts of lewd conduct on a child under 14 (§ 288, subd. (a)). Counts 1 and 2 were alleged to have

---

[1] All further statutory references are to the Penal Code.

occurred in Santa Clara County, and counts 3 and 4 were alleged to have occurred in Lake County, within the meaning of section 784.7. The information further alleged that during the commission of counts 2 and 3 defendant had substantial sexual conduct with the victim (§ 1203.066, subd. (a)(8)), and that defendant had a served a prior prison term (§ 667.5, subd. (b)).

Prior to trial, defendant served a subpoena duces tecum on SBC for the telephone records of phone numbers used by M.F. The records were submitted to the trial court and the court ordered them released to defense counsel. Defendant waived jury trial on the prison prior allegation.

*Prosecution's case*

The parties stipulated that defendant was convicted of inflicting corporal injury on a cohabitant, M.F., a misdemeanor, on or about September 26, 1992. He was convicted of inflicting corporal injury on a cohabitant, M.F., a misdemeanor, and battery upon M.F., on or about August 10, 1994. As a result of this conviction, defendant was placed on formal probation effective September 12, 1994, for two years. Defendant was convicted of inflicting corporal injury resulting in a traumatic condition on a spouse, M.F., a felony, on or about October 18, 1995. As a result of this conviction, defendant was on parole from March 11, 1998 to March 11, 2001. M.F. testified that she suffered misdemeanor convictions in 1989, 1993, and 1996.

Defendant is Ma's[2] stepfather and G.'s father, so Ma and G. are step-sisters. At the time of the February 2004 trial, both Ma and G. were 13 years old and in the eighth grade. Ma testified that when she was nine or ten, she lived with defendant, her mother M.F., and her younger brother in an apartment in San Jose. Sometimes G. would spend the night with them.

---

[2] To protect the identity of the child, we identify her as "Ma."

2

The first time defendant touched Ma in a way that made her feel uncomfortable was sometime between October and December 2000. She was at the apartment with defendant and G., watching television. She moved from the floor to lie down on the couch, as she was falling asleep. She felt defendant's hand on her buttocks, moving toward her vagina. Because she was afraid and did not know what to do, she just stayed where she was. Defendant touched her breasts under her clothes with his mouth and put his penis inside her vagina. She remembers feeling "wet stuff" come out and on to her. The touchings stopped when Ma made herself fall off the couch. She put her pants back on, went over to lie down beside G., and told G. that defendant had done something to her. Defendant said, " 'Let's go upstairs,' " but Ma just fell asleep.

Ma told her mother about the incident just prior to the family's move to Lake County. M.F. confronted defendant, but did not call the police.

G. testified that one time when she was visiting defendant and Ma at the apartment, Ma told her that defendant was touching M. in a bad way. She and Ma were upstairs in Ma's bedroom reading a book at the time Ma said this. G. asked Ma if Ma wanted her to tell Ma's mother, but Ma said no. G. did not tell anyone about what Ma told her. G. noticed that Ma and defendant continued to spend time together.

Defendant's family moved in with defendant's parents in Lake County in December 2000. One night while living there, defendant, Ma and her brother camped out in a tent on the deck of defendant's parents' house. Ma was asleep when she felt what she thought was defendant's penis touching her mouth.[3] It tickled like a fly does when it lands on her. She swatted it away and moved away from defendant. Defendant then touched her vagina with his hand and his penis. She was embarrassed and afraid. The

---

[3] "[THE PROSECUTOR]: What woke you up?
"[M.]: I think what first happened is I felt something touch my mouth.
"[THE PROSECUTOR]: What did you feel touch your mouth?
"[M.]: I think it was his penis."

touchings stopped when she moved away from defendant. She did not tell anybody about the touchings right away because she did not know what would happen if she did. Ma, her mother and her brother moved back to San Jose in June 2001.

The parties stipulated that defendant was convicted of corporal injury on a spouse, a misdemeanor, on or about March 30, 2002, in Santa Rosa, and that the victim was not M.F.[4]

On July 21, 2002, Ma saw a television report of the abduction and death of a little girl in Los Angeles, which upset her. Ma told her mother that she had been sexually abused. M.F. reported the abuse to the police. On July 21, 2002, San Jose Police Officer Rocky Zanotto responded to the report of an alleged child molest. He met with M.F., then separately talked to Ma, who was upset and crying. Officer Zanotto took a brief statement from Ma and forwarded it to the investigation unit.

San Jose Police Detective Louis Lucero interviewed Ma at her school on November 19, 2002. The interview was audio-taped and the tape, exhibit 5, was played for the jury. During the interview Ma said that defendant had touched her on her breast with his mouth and on her vagina with his penis two times when she was ten. The touchings occurred on the couch in their apartment in San Jose around Halloween, and again after they moved to defendant's mother's home in Lake County. During the touchings in San Jose, she felt "wet stuff" inside herself. Defendant tried to get her to go upstairs, but she went over and woke up G., who was sleeping on the floor. Ma told G. that defendant tried to do something to her, and G. wanted to tell Ma's mother, but she did not want her to. The same touchings occurred in Lake County when she was camping in the backyard with defendant and her brother. There, defendant also tried to put his penis in her mouth, but she moved away from him and pretended to be asleep.

---

[4] Defendant was placed on probation as a result of the conviction.

Ma had a physical examination on December 2, 2002. The physician's assistant who examined Ma found no evidence of penetrating trauma, which finding was consistent with a report by a girl of Ma's age of having had sexual contact almost two years before.

Carl Lewis, an investigator for the district attorney, testified as an expert on Child Sexual Abuse Accommodation Syndrome. The syndrome describes the processes children might go through when disclosing sexual abuse. Some children might accommodate the abuse by trying to act as though nothing is wrong. The disclosure of the abuse is almost always delayed, and often occurs at a time when the child is least likely to be believed.

*The defense case*

S., a sixth-grade classmate of Ma, testified that Ma told her that defendant had touched Ma, and that he had threatened to kidnap Ma because he did not have visiting rights. S. thought that Ma meant that defendant had hit her; S. did not think that Ma meant that defendant had touched her in a sexual manner.

Pastor Rodger Wedan testified that defendant and M.F. joined his church when they moved to Lake County. They attended services and participated in other church activities, such as youth gatherings, as did Ma and her brother. Wedan never saw any disharmony between defendant and M.F. during the time that M.F. lived in the area.

Linda Smith testified that defendant is her nephew. Defendant, his parents, and Ma attended a family gathering in Ukiah in late May 2001. M.F. and Ma's brother did not attend the gathering. Linda Smith did not observe any unusual interaction between defendant and Ma during the gathering.

Shannon Sample testified that she lives next door to defendant's parents. Sample saw defendant and Ma together, and did not see any unusual interaction between them. In June 2001, Ma called and said that she was looking for a home for her tortoise because she would be moving and was not allowed to have it. Ma and defendant brought the

tortoise over to Sample's home. Sample saw Ma and her brother at church with defendant and his parents after accepting the tortoise.

Defendant testified that he never did anything to Ma of a sexual nature, and that he has no explanation of why she would say that he molested her. At no time prior to their move to Lake County did M.F. ever accuse him of doing something to Ma. He would sometimes sit on the couch cuddling with Ma or G., watching television. After the move, M.F. never told him that she was concerned about Ma and him. He and Ma often went places together alone, and Ma never acted as though she did not want to be around him. They often snacked in the tent on his mother's deck, but they never slept overnight in it.

M.F. called defendant when she received a subpoena to testify in his Santa Rosa domestic violence case. She said that she did not want to testify against him, and said that if he pleaded guilty she would not have to. He told her to stop calling him, and said that she was going to have to go to Santa Rosa. She responded, " 'Watch what I'll do.' "

Robert Hilton, who has known defendant since the early 1980s, testified that a few years before trial, defendant came to his house late one night and asked to stay the night. Hilton allowed him to stay the night.

Defendant's 16-year-old son, G.'s brother, testified that he used to visit defendant, M.F., and their children in San Jose with G. When they stayed overnight, he slept in the living room on the couch. He does not remember G. and Ma ever being in the living room watching television when everybody was going to bed. Nor does he remember ever seeing defendant and Ma alone, sitting on the couch.

*Verdict, new trial motion, and sentencing*

On February 18, 2004, the jury found defendant guilty of all four counts of lewd conduct on a child (§ 288, subd. (a)), and found true the allegations that during the commission of the offenses in count 2 and 3 defendant had substantial sexual conduct with the child (§ 1203.066, subd. (a)(8)). On May 25, 2004, new counsel filed a motion for new trial on the grounds of ineffective assistance of prior defense counsel. The

6

prosecutor filed opposition to the motion. On July 20, 2004, defendant submitted a request for the court to release newly subpoenaed telephone records. After a hearing, the court denied the request to release the records and also denied the motion for new trial. The court then granted the prosecutor's motion to dismiss the alleged prison prior, and sentenced defendant to 10 years in state prison.

DISCUSSION

*Section 784.7*

Section 784.7, subdivision (a), states in relevant part: "When more than one violation of Section . . . 288 . . . occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing, pursuant to Section 954, within the jurisdiction of the proposed trial. At the Section 954 hearing, the prosecution shall present evidence in writing that all district attorneys in counties with jurisdiction of the offenses agree to the venue. Charged offenses from jurisdictions where there is no written agreement from the district attorney shall be returned to that jurisdiction." Section 954 states in relevant part: "An accusatory pleading may charge two or more different offenses connected together in the commission, . . . . [T]he court in which a case is triable, in the interest of justice and for good cause shown, may, in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

Defendant contends that the convictions on counts 3 and 4 must be reversed and dismissed because there is no evidence in the record that the prosecutor complied with the procedural requirements of section 784.7. "There is no record in the clerk's transcript of a Section 954 hearing, or any other hearing, proceeding or documents where the prosecutor in Santa Clara County presented evidence in writing that the district attorney of Lake County agreed to Santa Clara County as the venue for the Lake County charges."

7

Section 784.7 was enacted by the Legislature as an exception to the general rule of territorial jurisdiction or venue in section 777, which states that, "except as otherwise provided by law the jurisdiction of every public offense is in any competent court within the jurisdictional territory of which it is committed." "Section 784.7 was enacted to protect repeat victims of child abuse or molestation and victims of domestic violence, offenses that are often inflicted on the same victim by the same perpetrator, from the need to make multiple court appearances to testify against the perpetrator and to reduce costs of separate trials." (*Price v. Superior Court* (2001) 25 Cal.4th 1046, 1055.) "The Legislature has made section 784.7 an exception to the general venue statute, and has thereby authorized the prosecution to elect [Santa Clara] County as an alternative venue for trial of the [Lake] County charge[s]." (*Id.* at p. 1056.)

When originally enacted, section 784.7 required that the defendant and the victim be "the same for all of the offenses." (Stats. 1998, ch. 302, § 1.) However, in 2002 the Legislature amended the section to eliminate that requirement. At the same time, the Legislature added the provision relating to the procedures for consolidating the charges. (See Stats. 2002, ch. 194, § 2; *People v. Betts* (2005) 34 Cal.4th 1039, 1058, fn. 14.) Defendant argues that because the Legislature "twice used the word 'shall' to direct these procedures, it is apparent that the Legislature intended 'shall' to be mandatory. It is also apparent that the Legislature intended jurisdiction of an offense in one county where that prosecutor did not agree in writing to trial of that offense in another county, to reside only in the county where the offense occurred."

There is no question that venue was proper in Santa Clara County as long as the procedural requirements of section 784.7 were met. Because two of the four charged section 288 offenses occurred in Santa Clara County, the other two charged section 288 offenses that occurred in Lake County were properly joined and tried in Santa Clara County, "subject to a hearing, pursuant to Section 954" within Santa Clara County.

8

(§ 784.7, subd. (a).)  Although there is nothing in the record indicating that a section 954 hearing was held, there is also nothing in the record indicating that defendant ever objected to the lack of a writing from the district attorney of Lake County agreeing to venue in Santa Clara County.

The commencement of a proceeding in an improper venue is a defect that can be remedied easily if the issue is timely raised, and a defendant's failure to raise a timely objection to venue will often reflect a strategic decision on the part of the defense. (*People v. Simon* (2001) 25 Cal.4th 1082, 1104, fn. 15 (*Simon*).)  Defendant contends that, since section 784.7 was amended in 2002, after *Simon* was decided, he was not required to raise an objection below in order to raise the issue on appeal.  If defendant had ever raised an objection prior to trial to the lack of a writing from the district attorney of Lake County agreeing to venue in Santa Clara County, trial on counts 3 and 4 would not have occurred in Santa Clara County unless such a writing was presented at a section 954 hearing.  Our Supreme Court has stated that, "taking into account the nature and purpose of the venue safeguard and the substantial state interest in protecting the integrity of the process from improper 'sandbagging' by a defendant, we conclude that a defendant who fails to raise a timely objection to venue in a felony proceeding forfeits the right to object to venue—either at trial or on appeal. [Citations.]" (*Simon, supra*, 25 Cal.4th at p. 1104, fn. omitted.)  Accordingly, we find in this case that defendant has forfeited his right to object to the trial in Santa Clara County of the offenses in counts 3 and 4 that occurred in Lake County.

## Count 4

The second amended information alleged in count 4 that defendant committed a lewd or lascivious act on a child under 14, in violation of section 288, subdivision (a), between December 1, 2000 and June 30, 2001, in Lake County.  The prosecutor informed the jury that count 4 was based on Ma's testimony that defendant "put his penis against her mouth."  Defendant contends that, taken as a whole, Ma's testimony is insufficient to

9

establish beyond a reasonable doubt that the object that touched Ma's lips and woke her was defendant's penis, or that it occurred in Lake County, or that it occurred between December 1, 2000 and June 30, 2001. "Given [Ma's] description that the object that touched her lips felt like a fly that tickled, and she 'swished' it off with her hand, it is in fact extremely unlikely that a penis touched her lips." "[T]he location and timing of that incident were so confused that a jury could not find beyond a reasonable doubt that any such incident occurred in Kelseyville, or that it occurred in the time-frame charged."

In determining whether the evidence is sufficient to support a conviction, we "review 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Johnson* [(1980)] 26 Cal.3d 557, 578.) Under this standard, the court does not ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)" (*People v. Hatch* (2000) 22 Cal.4th 260, 272.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

The evidence presented at trial was that defendant and his family moved in with defendant's parents in Lake County in December 2000, and that the family, except for defendant, moved back to San Jose in June 2001. One night, while living in Lake County, Ma was sleeping in a tent on defendant's parents' deck with defendant and her brother when Ma felt what she "thought" was defendant's penis touching her mouth. She swatted it away as though it were a fly, moved away from defendant, and pretended to go back to sleep. Defendant then touched her vagina with his penis. During her interview with Detective Lucero, Ma gave the details of this incident in response to the detective's question whether defendant did anything else to her in Lake County. The fact that, after giving the details of this incident, Ma told the detective that the incident occurred "in the bedroom," does not mean that Ma said that the offense occurred in San Jose rather than Lake County.

The transcript of Detective Lucero's interview of M. shows the following:

"LUCERO: . . . Where was the second time at?

"[Ma]: It, it was me and my brother and him were, were camping. We had, we set out a little camp in the backyard to make it look like we were camping.

"LUCERO: Where were you living at?

"[Ma]: The same place.

"LUCERO: Kelseyville? [Slight pause] Where was your mom at?

"[Ma]: Inside, sleeping, because she didn't want to go out.

"LUCERO: Okay.

"[Ma]: And camp.

"LUCERO: Who was camping outside?

"[Ma]: Just me, my brother, and him. But my brother was already asleep.

"LUCERO: Oh. And what happened?

"[Ma]: The same thing.

"LUCERO: He managed to take your clothes off?

11

"[Ma]: Uh, pulled them up.

"LUCERO: What were you wearing?

"[Ma]: My pajamas.

"LUCERO: What kinda pajamas were they?

"[Ma]: I can't remember, but I know I wear pajamas.

"LUCERO: But were they the kind where he could pull 'em, up and your underwears . . .

"[Ma]: They were the kind—

"LUCERO: Would be exposed?

"[Ma]: No, my, my underwears, he pulled them down (inaudible) like regular clothes.

"LUCERO: Uh-huh. And after he pulled 'em down, what did he do?

"[Ma]: Tried to pull down my underwear; he pulled 'em down a little bit.

"LUCERO: And then what did he do?

"[Ma]: Tried to take off his, and put his dinky in my cookie.

"LUCERO: And did he?

"[Ma]: Yes.

"LUCERO: And what did you feel?

"[Ma]: Same thing. I was scared.

"LUCERO: Did it hurt?

"[Ma]: A little bit.

"LUCERO: Did you ever bleed?

"[Ma]: No.

"LUCERO: No? On the second time, in the camp, in the tent, did uh, did you feel that same nasty stuff again? Did Frank ever do anything else to you in Kelseyville?

"[Ma]: Yeah.

"LUCERO: What else did he do?

12

"[Ma]: He tried to put his dinky in my mouth.

"LUCERO: And what happened?

"[Ma]: I moved away.

"LUCERO: Did he manage to put it in your mouth?

"[Ma]: No.

"LUCERO: Did it get near your mouth? Where did it touch you at?

"[Ma]: Right here.

"LUCERO: How many times did he do that, [Ma]?

"[Ma]: Just once, that one time.

"LUCERO: One. Did he say anything to you?

"[Ma]: No.

"LUCERO: Did you say anything to him?

"[Ma]: No. I pretended to be asleep.

"LUCERO: Oh, okay. Where were you at when he did that?

"[Ma]: In the bedroom.

"LUCERO: Bedroom? Where was your mom?

"[Ma]: I don't know where she was.

"LUCERO: And your brother?

"[Ma]: I don't remember.

"LUCERO: Did his daughter live[] there also?

"[Ma]: No, he—

"LUCERO: No?

"[Ma]: She lived with her mom.

"LUCERO: Lived with her mom? Had she, has her daugh--, his daughter ever talked to you about anything like this?

"[Ma]: No."

We find, in light of the whole record, including Ma's testimony at trial and her recorded interview by Detective Lucero, that there is substantial evidence to support the jury's finding that defendant touched Ma's mouth with his penis in Lake County between December 1, 2000 and June 30, 2001.

*New trial motion*

As stated above, prior to trial defense counsel subpoenaed telephone records for phone numbers used by M.F. The court ordered the records released to counsel. While defendant's new trial motion was pending, new defense counsel subpoenaed additional telephone records. New counsel informed the court that prior counsel "subpoenaed phone records but for the wrong dates. So the phone records had no relevance for anything." Based on defendant's claim that he received a number of hang-up calls late at night and early in the morning in the month prior to July 21, 2001, that this activity was consistent with M.F.'s prior conduct, and that M.F. knew that defendant was remarrying on July 22, 2001, new counsel requested release of the additional phone records to see if M.F. made the hang-up calls. The prosecutor argued that M.F. was impeached by defense counsel during the trial in many other ways, and that one more piece of impeachment evidence would not be a determining factor in the case. The court denied the request to release the records, finding that the records would not be impeachment evidence unless M.F. denied making the calls, and that prior defense counsel had already extensively impeached M.F.

In later denying the motion for new trial the court stated in part: "With regard to, essentially, a lot of the arguments that are made by the defense deal with the jealousy of [M.F.], the fulcrum date regarding the allegations, and the allegations that [M.F.] was controlling, calling the shots, as you mentioned. And they sort of, in my view, can be sort of lumped together in the sense that they are attacking [M.F.'s] character and credibility. [¶] I would have to say that the character and credibility of [M.F.] was destroyed as effectively as I have ever seen any witness'[s] credibility and character

destroyed in my entire career. [¶] I doubt that having additional information, arguing that in addition to all these other things that you've heard, keep in mind the significance of the date of the allegations, that that would have, in any way – I don't think there's any showing that that would have caused the jury to reach a different result."

Defendant contends that because no evidence was presented by defense counsel at trial that M.F. knew that defendant was to be remarried the day after she made the child molest report, and because the phone records were a "qualitatively different" type of impeachment evidence, the trial court erred in denying his request to release the phone records. He argues, without citation of authority, that the matter should be returned to the trial court for reconsideration of the new trial motion after release of the subpoenaed phone records.

"The defendant generally is entitled to discovery of information that will assist in his defense or be useful for impeachment or cross-examination of adverse witnesses. [Citation.] A motion for discovery must describe the information sought with some specificity and provide a plausible justification for disclosure. [Citation.] The court's ruling on a discovery motion is subject to review for abuse of discretion. [Citation.]

"Under the due process clause of the federal Constitution, the government has the obligation to disclose to the defendant evidence in its possession that is favorable to the accused and material to the issues of guilt or punishment. [Citations.] Evidence is material if a reasonable probability exists that a different result would have occurred in the proceeding had the evidence been disclosed to the defense. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. [Citations.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 953-954 (*Jenkins*).)

The trial court found that the phone records defendant sought were not material to the defense, as the evidence was cumulative and it was not such as to render a different result probable on retrial of the cause. (*Jenkins, supra,* 22 Cal.4th at p. 954.; cf., § 1181, subd. 8.) The requested evidence was cumulative to evidence that was presented at trial.

The evidence at trial showed that M.F. repeatedly allowed defendant and Ma to be alone together after Ma first reported defendant's conduct to M.F. The evidence further showed that after July 21, 2002, when M.F. made the police report, she did not cooperate with the police. She did not bring Ma in for requested interviews with Detective Lucero, so after several months the detective went to Ma's school to interview Ma in M.F.'s absence. M.F. also failed to bring Ma in for two scheduled physical examinations prior to the examination that occurred on December 2, 2002. Defense counsel also argued to the jury that M.F.'s conduct showed that the reported lewd conduct did not occur.

The trial court also found that the requested evidence was not such as to render a different result probable on retrial. We agree with the trial court. In addition to Ma's trial testimony and her taped interview with Detective Lucero detailing the specifics of the two separate incidents of lewd conduct, the jury heard testimony from both G. and S. stating that Ma told them prior to M.F.'s police report that defendant had touched her. Given this evidence at trial supporting the conviction apart from M.F.'s testimony, defense counsel's extensive cross-examination of M.F., and counsel's argument to the jury regarding M.F.'s conduct, we find that the trial court acted within its discretion in determining that defendant had not shown sufficient cause to warrant release of the subpoenaed phone records.

## DISPOSITION

The judgment is affirmed.

_____
                BAMATTRE-MANOUKIAN, ACTING P.J.



WE CONCUR:



_____
      MCADAMS, J.



_____
      DUFFY, J.



_People v. Rodriguez_
H0227959

17

# EXHIBIT B

Court of Appeal, Sixth Appellate District - No. H027959
S143741

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

FLORENCIO TORRES RODRIGUEZ, Defendant and Appellant.

Petition for review DENIED.

SUPREME COURT
F I L E D

JUN 28 2006

Frederick K. Ohlrich Clerk

_____
DEPUTY

GEORGE
_____
Chief Justice

RICHARD J. PETERSEN, SBN# 41012
PATRICIA LITTLEFIELD, SBN# 132686
444 North School Street
Ukiah, California 95482
Telephone:    (707) 468-5184
Fax:          (707) 462-0472
Email:        p.littlefield@earthlink.net

Attorneys for Petitioner
Florencio Torres Rodriguez

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FLORENCIO TORRES RODRIGUEZ,

       Petitioner,

     v.

RICHARD SUBIO,

       Warden, Mule Creek State Prison,
       Respondent.

No. _____

**PROOF OF SERVICE BY MAIL**

    I am a citizen of the United States and a resident of Marin County. I am over the age of 18 years and not a party to the within above-entitled action. My business address is P.O. Box 337, Bolinas, CA 94924.

    On September 17, 2007, I served the within **PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY (28 U.S.C. § 2254)** on the interested parties in said action by causing to be placed a true copy thereof enclosed in a sealed envelope with postage thereon fully prepared in a U.S. Post Office box addressed to the parties as follows:

Rene A. Chacon
Office of the Attorney General
State of California
455 Golden Gate Ave, #11000
San Francisco, CA 94102
(Counsel for Respondent)

Florencio Rodriguez, V-44470
Mule Creek State Prison
P.O. Box 409060
Ione, CA 95649
(Petitioner)

Proof of Service by Mail

*Rodriguez v. Subia*
No. _____

1        I declare under penalty of perjury that the foregoing is true and correct and that

2    this declaration was executed on September 17, 2007.

3

4

5    Sabine Jordan

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Rodriguez v. Subia*

No. _____