1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  JULIET B. HALEY
   Deputy Attorney General
5  RENÉ A. CHACÓN, State Bar No. 119624
   Supervising Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5957
    Fax:  (415) 703-1234
8   Email:  rene.chacon@doj.ca.gov

9  Attorneys for Respondent

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13
   **FLORENCIO TORRES RODRIGUEZ,**          No. C 07-04796 WHA
14
                               Petitioner,
15
        **v.**
16
   **RICHARD SUBIO,**
17
                               Respondent.
18

19
      **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**
20

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  JULIET B. HALEY
   Deputy Attorney General
5  RENÉ A. CHACÓN, State Bar No. 119624
   Supervising Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5957
    Fax:  (415) 703-1234
8   Email:  rene.chacon@doj.ca.gov

9  Attorneys for Respondent

10            IN THE UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13

14  **FLORENCIO TORRES RODRIGUEZ,**                 No. C 07-04796 WHA

                                    Petitioner,     **MEMORANDUM OF POINTS**
15                                                  **AND AUTHORITIES IN**
         **v.**                                     **SUPPORT OF ANSWER**
16
    **RICHARD SUBIO,**
17
                                    Respondent.
18

19

20                       **INTRODUCTION**

21          Petitioner, Florencio Torres Rodriguez, is presently serving a 10-year sentence for

22  convictions of four counts of lewd conduct on a child under 14 years of age, Cal. Penal Code §

23  288(a).  On September 18, 2007, petitioner filed the instant petition for writ of habeas corpus under

24  28 U.S.C. § 2254.  On September 24, 2007, the Court issued the Order to Show Cause finding three

25  cognizable claims:  (1) the trial court had improper venue with respect to counts three and four and

26  therefore violated petitioner's due process rights; (2)there was  insufficient evidence with respect

27  to count four in violation of due process; and (3) ineffective assistance of counsel in violation of

28  petitioner's Sixth Amendment rights.  *See* Order to Show Cause.

1

## STATEMENT OF THE CASE

2       By amended information the Santa Clara County District Attorney charged petitioner with

3   four counts of lewd and lascivious conduct on a child under the age of 14 years, Cal. Penal Code §

4   288(a), and alleged substantial sexual conduct with respect to two counts, Cal. Penal Code §

5   1203.066(a)(8).  *See* Respondent's Exhibit A at 130-34 (Clerk's Transcript hereinafter referred to

6   as "CT").  The information also alleged one prior prison term commitment, Cal. Penal Code §

7   667.5(b).  CT at 133.

8       On February 18, 2004, a jury found petitioner guilty as charged and found true the

9   substantial sexual conduct allegations with respect to two counts.  CT at 247-50, 253.

10      On July 20, 2004, the trial court denied the defense motion for a new trial.  CT at 381.

11  The trial court denied petitioner probation and imposed a 10-year prison term.  CT at 381, 384-85.

12      On April 17, 2006, the California Court of Appeal affirmed the judgment in an

13  unpublished decision.  *See* Petn. Exh. A.

14      On June 28, 2006, the California Supreme Court denied the petition for review.  *See* Petn.

15  Exh. B.

16      On September 18, 2007, petitioner filed the instant petition for writ of habeas corpus under

17  28 U.S.C. § 2254.  On September 24, 2007, the Court issued the Order to Show Cause.

18

## LEGAL STANDARDS

19      This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

20  (AEDPA), which imposes a "highly deferential" standard for evaluating state court rulings and

21  "demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537

22  U.S. 19, 24 (2002) (per curiam).  Under AEDPA, the federal court has no authority to grant habeas

23  relief unless the state court's ruling was "contrary to, or involved an unreasonable application of,"

24  clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  A decision constitutes an

25  unreasonable application of Supreme Court law if the state court's application of law to the facts is

26  not merely erroneous, but "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

27  Thus, "[o]nly if the evidence is 'too powerful to conclude anything but' the contrary" should the

28  court grant relief.  *Edwards v. Lamarque*, 476 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  The

1  petitioner bears the burden of showing that the state court's decision was unreasonable. *Visciotti*,

2  537 U.S at 25.

### STATEMENT OF FACTS

3

**Prosecutor's Case In Chief**

4

5      Thirteen-year-old Maile Doe described petitioner as her stepfather. *See* Respondent's

6  Exhibit E at 63 (hereinafter referred to as "RT"). When she resided in an apartment on Lapala

7  Drive, Maile was 10 years old. RT at 64. Sometime after Halloween, petitioner sexually touched

8  Maile in that apartment. RT at 66, 82. While falling asleep in front of the television with her

9  stepsister Gabrielle, petitioner touched Maile's "private area" or vagina. RT at 68-69. Petitioner

10  then touched her vagina with his penis, penetrating her. RT at 70-71, 273. Petitioner touched

11  Maile's breasts with his mouth. RT at 71-72, 272-73. Petitioner also touched Maile's "butt." RT

12  at 79. The touching stopped when Maile got off the couch. RT at 74. Petitioner invited Maile

13  upstairs. RT at 75. Maile had "wet stuff" on her vagina. RT at 77, 273.

14      In 2001, while Maile was in the fifth grade, the family moved to Kelseyville. RT at 88.

15  There, petitioner sexually touched Maile while the children were "camping outside on the balcony."

16  RT at 92. While asleep on an air mattress, Maile felt "something touch her mouth" that Maile

17  swatted away with her hand. RT at 94. Maile believed it "was [petitioner's] penis." RT at 94.

18  Maile remembered that petitioner put his penis up against her mouth while Maile was in the tent.

19  RT at 150, 276. Petitioner also touched Maile's vagina with his hand and penis, "inside and out."

20  RT at 95, 150. At some point, Maile reported the touches to her mother. RT at 99. Maile had no

21  doubt that petitioner penetrated her vagina with his penis. RT at 106.

22      Thirteen-year-old Gabrielle Doe described petitioner as her father. RT at 157. Maile told

23  Gabrielle that petitioner had touched her inappropriately. RT at 159-60. After the report, Gabrielle

24  saw them together, and they continued to hug each other. RT at 168.

25      On July 21, 2002, San Jose Police officer Rocky Zanotto responded to a child molest

26  report. RT at 178. Maile was crying and did not want to talk at first. RT at 179. She gradually

27  became comfortable talking about the incidents. RT at 181.

28      Officer Louis Lucero taped an interview with Maile. RT at 268. The taped interview was

1  played for the jury.  RT at 296.

2       By stipulation, the parties informed the jury that petitioner was convicted of misdemeanor

3  inflicting corporal injury on Melanie F., misdemeanor battery on Melanie F., and felony inflicting

4  corporal injury resulting in a traumatic condition on Melanie F. *See* Respondent's Exhibit D at 4-5.

5  The jury was also informed that petitioner was additionally convicted of misdemeanor corporal

6  injury on a spouse who was not Melanie F.  RT at 379.

7       Melanie F. described Maile as her daughter.  Exhibit D at 6.  Petitioner and Melanie F.

8  were married about 10 years.  Exhibit D at 7.  Melanie F. had convictions for misdemeanor petty

9  theft, misdemeanor embezzlement, and misdemeanor petty theft with a prior.  Exhibit D at 8-9.

10  Maile reported being sexually abused by petitioner.  Exhibit D at 10.

11       On December 2, 2002, SART examiner Marylou Ritter examined Maile.  Exhibit D at 44.

12  There was no evidence of penetrating trauma.  Exhibit D at 46.  The finding was consistent with

13  Maile's report.  Exhibit D at 46-48.

14       District Attorney investigator Carl Lewis qualified as an expert on Child Abuse

15  Accommodation Syndrome.  Exhibit D at 79.  Child sexual abuse typically occurs when the offender

16  is alone with the child.  Exhibit D at 82.  Abused children typically do not have sufficient "coping

17  mechanisms," making them feel helpless.  Exhibit D at 83.  Abused children typically delay

18  reporting because they feel conflicted.  Exhibit D at 84.  Reporting typically occurs at a time when

19  the child is least likely to be believed.  Exhibit D at 85.  Pressures increase on the reporting child

20  causing the child to retract.  Exhibit D at 86.

21  **Defense Case**

22       Shantayana J. was Maile's classmate in the sixth grade.  RT at 320.  Maile reported that

23  petitioner had touched her inappropriately.  RT at 322.  There was no indication that the touch was

24  sexual.  RT at 322.  Maile also reported that petitioner was trying to kidnap her because he had no

25  visitation rights.  RT at 325.

26       Baptist Minister Rodger Wedan described petitioner's parents as members of his church.

27  RT at 329.  Petitioner and Melanie F. attended church "regular[ly]" after they moved to Lake

28  County.  RT at 329.

1    Shannon Lynn Sample described petitioner as her neighbor's son.  RT at 397.  Sample

2 observed petitioner's interactions with Maile and did not think anything "unusual" about those

3 interactions.  RT at 402.

4    Petitioner denied sexually touching Maile.  RT at 403, 434.  Petitioner described his

5 relationship with Melanie F. as "strenuous sometimes."  RT at 404.  Petitioner deserved to be

6 punished for his violence against Melanie.  RT at 404.  Petitioner had a conversation with Melanie

7 when Melanie telephoned petitioner.  RT at 405.  Melanie had just been subpoenaed and asked

8 petitioner what to do.  RT at 406.  Melanie complained that she did not want to drive up to the

9 courthouse.  RT at 406.  Melanie asked petitioner to plea bargain a disposition to keep her from

10 driving up.  RT at 407.  Petitioner asked Melanie to stop calling him.  RT at 407.  In response,

11 Melanie said, "'Watch what I'll do.'"  RT at 407.

12    Sixteen-year-old Frank is petitioner's son.  RT at 489.  Frank never saw petitioner sitting

13 alone on the couch with Maile.  RT at 493.

14                          **ARGUMENT**

15                             **I.**

16    **PETITIONER'S DUE PROCESS CHALLENGE TO TRIAL COURT**
   **VENUE IS PROCEDURALLY DEFAULTED BY THE LACK OF A**
17    **CONTEMPORANEOUS OBJECTION**

18

19    Petitioner asserts that the trial court denied him due process with respect to counts three

20 and four, which occurred in Lake County, for conducting trial in Santa Clara County in an alleged

21 violation of California Penal Code § 784.7.  *See* Petn. at 22-29.  The lack of a contemporaneous

22 objection to venue procedurally defaults the federal claim.

23    The California Court of Appeal found the claim defaulted from the lack of a

24 contemporaneous objection:

25        Section 784.7, subdivision (a), states in relevant part:  "When more than one
       violation of Section . . . 288 . . . occurs in more than one jurisdictional territory, the
26        jurisdiction of any of those offenses, and for any offenses properly joinable with that
       offense, is in any jurisdiction where at least one of the offenses occurred, subject to a
27        hearing, pursuant to Section 954, within the jurisdiction of the proposed trial.  At the
       Section 954 hearing, the prosecution shall present evidence in writing that all district
28        attorneys in counties with jurisdiction of the offenses agree to the venue.  Charged
       offenses from jurisdictions where there is no written agreement from the district attorney

shall be returned to that jurisdiction." Section 954 states in relevant part: "An accusatory pleading may charge two or more different offenses connected together in the commission, . . . . The court in which a case is triable, in the interest of justice and for good cause shown, may, in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

Defendant contends that the convictions on counts 3 and 4 must be reversed and dismissed because there is no evidence in the record that the prosecutor complied with the procedural requirements of section 784.7. "There is no record in the clerk's transcript of a Section 954 hearing, or any other hearing, proceeding or documents where the prosecutor in Santa Clara County presented evidence in writing that the district attorney of Lake County agreed to Santa Clara County as the venue for the Lake County charges."

Section 784.7 was enacted by the Legislature as an exception to the general rule of territorial jurisdiction or venue in section 777, which states that, "except as otherwise provided by law the jurisdiction of every public offense is in any competent court within the jurisdictional territory of which it is committed." "Section 784.7 was enacted to protect repeat victims of child abuse or molestation and victims of domestic violence, offenses that are often inflicted on the same victim by the same perpetrator, from the need to make multiple court appearances to testify against the perpetrator and to reduce costs of separate trials." (*Price v. Superior Court* (2001) 25 Cal.4th 1046, 1055.) "The Legislature has made section 784.7 an exception to the general venue statute, and has thereby authorized the prosecution to elect [Santa Clara] County as an alternative venue for trial of the [Lake] County charges." (*Id.* at p. 1056.)

When originally enacted, section 784.7 required that the defendant and the victim be "the same for all of the offenses." (Stats. 1998, ch. 302, § 1.) However, in 2002 the Legislature amended the section to eliminate that requirement. At the same time, the Legislature added the provision relating to the procedures for consolidating the charges. (See Stats. 2002, ch. 194, § 2; *People v. Betts* (2005) 34 Cal.4th 1039, 1058, fn. 14.) Defendant argues that because the Legislature "twice used the word 'shall' to direct these procedures, it is apparent that the Legislature intended 'shall' to be mandatory. It is also apparent that the Legislature intended jurisdiction of an offense in one county where that prosecutor did not agree in writing to trial of that offense in another county, to reside only in the county where the offense occurred."

There is no question that venue was proper in Santa Clara County as long as the procedural requirements of section 784.7 were met. Because two of the four charged section 288 offenses occurred in Santa Clara County, the other two charged section 288 offenses that occurred in Lake County were properly joined and tried in Santa Clara County, "subject to a hearing, pursuant to Section 954" within Santa Clara County. ( § 784.7, subd. (a).) Although there is nothing in the record indicating that a section 954 hearing was held, there is also nothing in the record indicating that defendant ever objected to the lack of a writing from the district attorney of Lake County agreeing to venue in Santa Clara County.

The commencement of a proceeding in an improper venue is a defect that can be remedied easily if the issue is timely raised, and a defendant's failure to raise a timely objection to venue will often reflect a strategic decision on the part of the defense. (*People v. Simon* (2001) 25 Cal.4th 1082, 1104, fn. 15 (*Simon*).) Defendant contends that, since section 784.7 was amended in 2002, after *Simon* was decided, he was not required to raise an objection below in order to raise the issue on appeal. If defendant had ever raised an objection prior to trial to the lack of a writing from the district attorney of Lake County agreeing to venue in Santa Clara County, trial on counts 3 and 4 would not have

occurred in Santa Clara County unless such a writing was presented at a section 954 hearing. Our Supreme Court has stated that, "taking into account the nature and purpose of the venue safeguard and the substantial state interest in protecting the integrity of the process from improper 'sandbagging' by a defendant, we conclude that a defendant who fails to raise a timely objection to venue in a felony proceeding forfeits the right to object to venue-either at trial or on appeal. [Citations.]" (*Simon, supra,* 25 Cal.4th at p. 1104, fn. omitted.) Accordingly, we find in this case that defendant has forfeited his right to object to the trial in Santa Clara County of the offenses in counts 3 and 4 that occurred in Lake County.

*See* Petn. Exh. A at 7-9.

The state appellate court deemed petitioner's challenge to the trial court's venue to be waived because he failed to raise the claim in the state trial court. Petn. Exh. A at 7-9. Accordingly, the federal claim is procedurally defaulted because the state courts "clearly and expressly" found the claim forfeited. *Harris v. Reed*, 489 U.S. 255, 260-63 (1989). The state procedural rule requiring a contemporaneous objection to venue was clear and well established at the time of petitioner's 2004 trial. *See People v. Simon*, 25 Cal.4th 1082, 1103-04 (Cal. 2001).[1]

Furthermore, petitioner has not demonstrated that this procedural bar is inadequate or that it is inconsistently applied. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003). Moreover, petitioner has not met his burden of demonstrating cause for, or prejudice resulting from, this procedural default, nor has petitioner demonstrated that the failure to reach this issue will result in a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 327 (1995).

## II.

## SUBSTANTIAL EVIDENCE SUPPORTS COUNT FOUR

Petitioner asserts that count four was not supported by sufficient evidence. *See* Petn. at 27-29. The record demonstrates sufficient evidence.

The Due Process Clause "protects the accused against conviction except upon proof

---

1. Petitioner argues that the question of venue was a pure question of law, qualifying his case for an exception to the state's waiver rule. *See* Petn. at 26. The Court of Appeal found "[t]here is no question that venue was proper in Santa Clara County as long as the procedural requirements of section 784.7 were met." Petn. Exh. A at 8. A defense objection and request for a section 954 hearing would have established whether the respective district attorneys had in fact signed a written agreement concerning venue or whether the Santa Clara location was in fact burdensome to the defense. The ultimate questions were entirely fact bound, requiring a defense objection to venue.

beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, which if proven, entitles him to federal habeas relief. *Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979). A federal court reviewing collaterally a state court conviction does not determine whether the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert denied*, 510 U.S. 843 (1993). The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*; (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof beyond a reasonable doubt, may the writ be granted. *Jackson*, 443 U.S. at 324.

On habeas review, a federal court evaluating the evidence under *In re Winship* and *Jackson v. Virginia* should take into consideration all of the evidence presented at trial. *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006). Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear on the record–that the trier of fact resolved such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

Here, count four charged a violation of Cal. Penal Code § 288(a), which provides: "Any person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."

The prosecutor informed the jury that count four related to the penis-to-mouth contact that

1    occurred in Kelseyville while Maile was camping inside a tent pitched on the balcony. RT at 529.

2    Maile testified that while she was in the fifth grade, the family moved to Kelseyville. RT at 88.

3    Once, when the children were "camping outside on the balcony," Maile was awakened when she felt

4    "something touch her mouth" that Maile swatted away with her hand. RT at 94. Maile believed it

5    "was [petitioner's] penis." RT at 94. Maile remembered that petitioner put his penis up against her

6    mouth while Maile was inside the tent. RT at 150. Maile reported the incident to police. RT at 276.

7    The jury heard Maile's recorded statement reporting that petitioner put his penis to her mouth. *See*

8    CT at 169 ("He tried to put his dinky in my mouth.").

9            The California Court of Appeal considered the trial record and determined that the record

10   supported count four, finding as follow:

11           The second amended information alleged in count 4 that defendant committed a lewd
12   or lascivious act on a child under 14, in violation of section 288, subdivision (a), between
     December 1, 2000 and June 30, 2001, in Lake County. The prosecutor informed the jury
13   that count 4 was based on Ma's testimony that defendant "put his penis against her
     mouth." Defendant contends that, taken as a whole, Ma's testimony is insufficient to
14   establish beyond a reasonable doubt that the object that touched Ma's lips and woke her
     was defendant's penis, or that it occurred in Lake County, or that it occurred between
15   December 1, 2000 and June 30, 2001. "Given [Ma's] description that the object that
     touched her lips felt like a fly that tickled, and she 'swished' it off with her hand, it is in
16   fact extremely unlikely that a penis touched her lips." "The location and timing of that
     incident were so confused that a jury could not find beyond a reasonable doubt that any
     such incident occurred in Kelseyville, or that it occurred in the time-frame charged."
17

18           In determining whether the evidence is sufficient to support a conviction, we "review
     'the whole record in the light most favorable to the judgment' and decide 'whether it
19   discloses substantial evidence . . . such that a reasonable trier of fact could find the
     defendant guilty beyond a reasonable doubt.' (*People v. Johnson* [(1980)] 26 Cal.3d 557,
20   578, 162 Cal. Rptr. 431.) Under this standard, the court does not ' "ask itself whether it
     believes that the evidence at the trial established guilt beyond a reasonable doubt."
21   [Citation.] Instead, the relevant question is whether, after viewing the evidence in the
     light most favorable to the prosecution, any rational trier of fact could have found the
22   essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979)
     443 U.S. 307, 318-319, 61 L. Ed. 2d 560.)" (*People v. Hatch* (2000) 22 Cal.4th 260, 272.)
23   "The standard of review is the same in cases in which the prosecution relies mainly on
     circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a
24   defendant if it finds that circumstantial evidence is susceptible of two interpretations, one
     of which suggests guilt and the other innocence [citations], it is the jury, not the appellate
25   court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If
     the circumstances reasonably justify the trier of fact's findings, the opinion of the
26   reviewing court that the circumstances might also reasonably be reconciled with a
     contrary finding does not warrant a reversal of the judgment." ' [Citations.]' ' [Citation.]"
     (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)
27

28           The evidence presented at trial was that defendant and his family moved in with
     defendant's parents in Lake County in December 2000, and that the family, except for

Memo. of Ps & As in Support of Answer- No. C 07-04796 WHA

9

defendant, moved back to San Jose in June 2001.  One night, while living in Lake County, Ma was sleeping in a tent on defendant's parents' deck with defendant and her brother when Ma felt what she "thought" was defendant's penis touching her mouth.  She swatted it away as though it were a fly, moved away from defendant, and pretended to go back to sleep.  Defendant then touched her vagina with his penis.  During her interview with Detective Lucero, Ma gave the details of this incident in response to the detective's question whether defendant did anything else to her in Lake County.  The fact that, after giving the details of this incident, Ma told the detective that the incident occurred "in the bedroom," does not mean that Ma said that the offense occurred in San Jose rather than Lake County.

The transcript of Detective Lucero's interview of M. shows the following:

"LUCERO: . . . Where was the second time at?

"[Ma]: It, it was me and my brother and him were, were camping.  We had, we set out a little camp in the backyard to make it look like we were camping.

"LUCERO: Where were you living at?

"[Ma]: The same place.

"LUCERO: Kelseyville? [Slight pause]  Where was your mom at?

"[Ma]: Inside, sleeping, because she didn't want to go out.

"LUCERO: Okay.

"[Ma]: And camp.

"LUCERO: Who was camping outside?

"[Ma]: Just me, my brother, and him. But my brother was already asleep.

"LUCERO: Oh. And what happened?

"[Ma]: The same thing.

"LUCERO: He managed to take your clothes off?

"[Ma]: Uh, pulled them up.

"LUCERO: What were you wearing?

"[Ma]: My pajamas.

"LUCERO: What kinda pajamas were they?

"[Ma]: I can't remember, but I know I wear pajamas.

"LUCERO: But were they the kind where he could pull 'em, up and your underwears . . .

"[Ma]: They were the kind-

1    "LUCERO: Would be exposed?

2    "[Ma]: No, my, my underwears, he pulled them down (inaudible) like regular clothes.

3    "LUCERO: Uh-huh. And after he pulled 'em down, what did he do?

4    "[Ma]: Tried to pull down my underwear; he pulled 'em down a little bit.

5    "LUCERO: And then what did he do?

6    "[Ma]: Tried to take off his, and put his dinky in my cookie.

7    "LUCERO: And did he?

8    "[Ma]: Yes.

9    "LUCERO: And what did you feel?

10   "[Ma]: Same thing. I was scared.

11   "LUCERO: Did it hurt?

12   "[Ma]: A little bit.

13   "LUCERO: Did you ever bleed?

14   "[Ma]: No.

15   "LUCERO: No? On the second time, in the camp, in the tent, did uh, did you feel that
     same nasty stuff again? Did Frank ever do anything else to you in Kelseyville?

16

17   "[Ma]: Yeah.

     "LUCERO: What else did he do?
18
     "[Ma]: He tried to put his dinky in my mouth.
19
     "LUCERO: And what happened?
20
     "[Ma]: I moved away.
21
     "LUCERO: Did he manage to put it in your mouth?
22
     "[Ma]: No.
23
     "LUCERO: Did it get near your mouth? Where did it touch you at?
24
     "[Ma]: Right here.
25
     "LUCERO: How many times did he do that, [Ma]?
26
     "[Ma]: Just once, that one time.
27
     "LUCERO:  One. Did he say anything to you?
28

1    "[Ma]: No.

2    "LUCERO: Did you say anything to him?

3    "[Ma]: No. I pretended to be asleep.

4    "LUCERO: Oh, okay. Where were you at when he did that?

5    "[Ma]: In the bedroom.

6    "LUCERO: Bedroom? Where was your mom?

7    "[Ma]: I don't know where she was.

8    "LUCERO: And your brother?

9    "[Ma]: I don't remember.

10    "LUCERO: Did his daughter live[] there also?

11    "[Ma]: No, he-

12    "LUCERO: No?

13    "[Ma]: She lived with her mom.

14    "LUCERO: Lived with her mom? Had she, has her daugh--, his daughter ever talked to
       you about anything like this?

15    "[Ma]: No."

16
17        We find, in light of the whole record, including Ma's testimony at trial and her
       recorded interview by Detective Lucero, that there is substantial evidence to support the
18     jury's finding that defendant touched Ma's mouth with his penis in Lake County between
       December 1, 2000 and June 30, 2001.

19    *See* Petn. Exh. A at 9-14; *see also* CT 167-70 (transcript of victim's taped statement).

20        The record shows that there was sufficient evidence from which a rational jury could have

21    concluded beyond a reasonable doubt that petitioner lewdly touched Maile while Maile was camping

22    inside a tent in Kelseyville, California.  Thus, the state courts' denial of the claim was not contrary

23    to, or an unreasonably application of *Jackson v. Virginia*, 443 U.S. 307, nor was it objectively

24    unreasonable in light of the totality of the evidence presented.

25                                              **III.**

26    **PETITIONER DOES NOT ESTABLISH INEFFECTIVE ASSISTANCE
       OF COUNSEL**

27
28        Petitioner asserts that trial counsel was ineffective for failing to seek release of phone

records "crucial to the defense's attempt to obtain a new trial for Rodriguez." *See* Petn. at 29. Petitioner argues "[t]he phone records constituted direct objective evidence showing that Melanie was lying under oath, whereas the remaining impeachment referred to by the trial court was of the nonobjective 'he said, she said,' nature." *Id.* at 30.  Petitioner also argues that "new trial counsel" was also ineffective for failing to "articulate the fact the evidence was not cumulative because it would have supplied an objective basis upon which to disbelieve Melanie Fountain, a basis that was not simply of 'he said, she said.'  This also constituted deficient performance that prejudiced Rodriguez." *See* Petn. at 16.

Clearly established federal law permits habeas relief for ineffective assistance of counsel only where counsel's performance was deficient and the petitioner was prejudiced by that deficiency. *See Strickland v. Washington*, 466 U.S. 668, 693 (1984).  To establish deficiency, a petitioner must point to the acts or omissions that rendered the representation objectively unreasonable. *Strickland v. Washington*, 466 U.S. at 690.  Then, ineffective assistance is demonstrated only where, but for the deficient performance, there is a reasonable probability that the result of the proceedings would have been different. *Id.* at 694.

Under AEDPA, the question is whether the state court reasonably applied *Strickland*, which is a "doubly deferential" standard of review. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam).

**A.  Factual Background**

Following jury trial, petitioner retained new counsel, Richard J. Petersen. *See* CT at 281.[2] New counsel petitioned the trial court to release sealed phone records for Melanie F. that had been delivered to the trial court pursuant to a defense subpoena. CT at 319-24.  Counsel sought in camera review of those records for eventual disclosure to the defense. *Id.* Counsel declared that "SBC Pacific Bell Telephone Company [records] will prove that the victim's mother, Melanie [F.], was calling the defendant repeatedly up to the day the incident was reported to police.  Additionally, she

---

2. Current federal habeas counsel is the same retained attorney who substituted into the case following the jury verdict.

1  had knowledge the defendant was getting remarried to another woman. Melanie [F.] was desperate

2  in her attempts to maintain contact and a relationship with the defendant." CT at 322.

3    On July 20, 2004, new defense counsel asked for an in camera hearing to demonstrate

4  cause and asserted that the trial court possessed sealed "subscriber information for an Ann [F.] at

5  a particular number and a subscriber from New Horizon Manufacture Homes." RT at 615. Defense

6  counsel asked the court to review the sealed records, in camera, so that the "Court can easily see

7  what I am asking for, it is relevant. And if it's not there, then of course, it would be no need to

8  divulge the records." RT at 615. The prosecutor agreed with the proposal that the trial court review

9  the sealed phone records to determine relevance. RT at 616. Thereafter, the trial court excluded the

10  prosecutor and proceeded in camera with new defense counsel. RT at 616.

11    When the trial court returned to open court, the trial court invited new defense counsel to

12  sum up his showing on relevance. RT at 623.[3/] Defense counsel summarized, as follows:

13    MR. PETERSON: Yes, your Honor. The defendant is at his fiancee's home of (707)
  528-4059. During that period of time, he received a number of hang-up calls. And he,

14    from the past, believes that it was probably his ex-wife separated from at that time, that
  was increasingly getting jealous and increasingly getting vindictive because that's what

15    she has done in the past. Calls where people would not answer but would hang on for a
  while.

16  

17    He believes that the two numbers that she would have used to do such hang-up calls
  are (408) 448-1798, which is a home number for Ann [F.]. And where she worked, "she"
  Melanie, worked at area code (408) 977-9190 sequentially to 9199, that's a New Horizon

18    Manufacture Homes.

19    So I was asking for the Court to review the documents to see if, in fact, there were
  any numbers from that number to those numbers or from those numbers to that number.

20    . . .

21    [THE PROSECUTOR]: How would those be relevant at this stage, given that there's
  no one to impeach or cross-examine regarding this information?

22  

23    THE COURT: Well, that's sort of what I said.

24    MR. PETERSON: Yeah.

25    [THE PROSECUTOR]: I was going to say, it's—

26  

27    3. Respondent has never received nor reviewed the phone records or sealed transcript of in
camera proceedings. Accordingly, respondent cannot provide this Court with a transcript of those

28  in camera proceedings. However, for purposes of the direct appeal, current habeas counsel received
a transcript of the trial court's in camera proceedings.

1    THE COURT: I guess the point is, do we need to know what is in those records in order to determine the issue of whether or not the failure to get those records and use those
2    records is, you know, essentially ineffectiveness of counsel?

3    MR. PETERSON: I don't know, your Honor, if she was asked, because he, the defense lawyer, knew of this, and that's why he asked for the records but got the wrong
4    set of records. So I don't know if he ever asked in direct examination, "Did you make such calls?" If he asked and she denied. . . .

5
    ME PETERSON: It would have been cross. I had it backwards. But if he had asked
6    that and she denied it, of course, it would be substantial impeachment. And if she admitted it, then he would have been able to say, "Why were you calling? What was the
7    purpose of this?" And then it would have shown more fully that there was a build-up of, at least, aggravation on her part.

8
    THE COURT: I have no recollection that—there certainly, to my recollection,
9    wasn't any extensive cross-examination, so I don't think that she—

10    [THE PROSECUTOR]: I don't recall it at all, your Honor. But the bigger picture, and I think this issue was actually addressed in Mr. Peterson's moving papers and my
11    response is, she was impeached on so many levels and in so many ways, and I flat out argued that they should throw out any testimony she provided. So I don't know how
12    adding one more piece of impeachment is making a bad person, who had demonstrated to be less than credible, a determining factor in this case.

13
    THE COURT: And I think that the argument that's made is that this evidence would
14    be circumstantial evidence of a motive to fabricate. But as I indicated to him, I think that argument was, in fact, made and made rather well by [trial counsel].

15
    So I'm going to deny the request for the records.

16
    RT at 623-25.
17
    **B.    The California Court Of Appeal Findings Concerning The Trial Court's**
18    **Refusal To Disclose The Phone Records**

19    The California Court of Appeal rejected petitioner's related claim that the trial court erred

20    by refusing to unseal and disclose to new defense counsel those phone records reviewed in camera.

21    As stated above, prior to trial defense counsel subpoenaed telephone records for phone numbers used by M.F. The court ordered the records released to counsel. While
22    defendant's new trial motion was pending, new defense counsel subpoenaed additional telephone records. New counsel informed the court that prior counsel "subpoenaed phone
23    records but for the wrong dates. So the phone records had no relevance for anything." Based on defendant's claim that he received a number of hang-up calls late at night and
24    early in the morning in the month prior to July 21, 2001, that this activity was consistent with M.F.'s prior conduct, and that M.F. knew that defendant was remarrying on July 22,
25    2001, new counsel requested release of the additional phone records to see if M.F. made the hang-up calls. The prosecutor argued that M.F. was impeached by defense counsel
26    during the trial in many other ways, and that one more piece of impeachment evidence would not be a determining factor in the case. The court denied the request to release the
27    records, finding that the records would not be impeachment evidence unless M.F. denied making the calls, and that prior defense counsel had already extensively impeached M.F.
28

Memo. of Ps & As in Support of Answer- No. C 07-04796 WHA

1    In later denying the motion for new trial the court stated in part:  "With regard to,
essentially, a lot of the arguments that are made by the defense deal with the jealousy of
2    [M.F.], the fulcrum date regarding the allegations, and the allegations that [M.F.] was
controlling, calling the shots, as you mentioned.  And they sort of, in my view, can be sort
3    of lumped together in the sense that they are attacking [M.F.'s] character and credibility.
[¶]  I would have to say that the character and credibility of [M.F.] was destroyed as
4    effectively as I have ever seen any witness'[s] credibility and character destroyed in my
entire career.  [¶]  I doubt that having additional information, arguing that in addition to
5    all these other things that you've heard, keep in mind the significance of the date of the
allegations, that would have, in any way - I don't think there's any showing that would
6    have caused the jury to reach a different result."

7    Defendant contends that because no evidence was presented by defense counsel at
trial that M.F. knew that defendant was to be remarried the day after she made the child
8    molest report, and because the phone records were a "qualitatively different" type of
impeachment evidence, the trial court erred in denying his request to release the phone
9    records.  He argues, without citation of authority, that the matter should be returned to the
trial court for reconsideration of the new trial motion after release of the subpoenaed
10    phone records.

11    "The defendant generally is entitled to discovery of information that will assist in his
defense or be useful for impeachment or cross-examination of adverse witnesses.
12    [Citation.] A motion for discovery must describe the information sought with some
specificity and provide a plausible justification for disclosure. [Citation.] The court's
13    ruling on a discovery motion is subject to review for abuse of discretion. [Citation.]

14    "Under the due process clause of the federal Constitution, the government has the
obligation to disclose to the defendant evidence in its possession that is favorable to the
15    accused and material to the issues of guilt or punishment. [Citations.] Evidence is material
if a reasonable probability exists that a different result would have occurred in the
16    proceeding had the evidence been disclosed to the defense.  A reasonable probability is
a probability sufficient to undermine confidence in the outcome of the proceedings.
17    [Citations.]"  (*People v. Jenkins* (2000) 22 Cal.4th 900, 953-954 (*Jenkins*).)

18    The trial court found that the phone records defendant sought were not material to
the defense, as the evidence was cumulative and it was not such as to render a different
19    result probable on retrial of the cause. (*Jenkins, supra,* 22 Cal.4th at p. 954.; cf., § 1181,
subd. 8.)  The requested evidence was cumulative to evidence that was presented at trial.
20    The evidence at trial showed that M.F. repeatedly allowed defendant and Ma to be alone
together after Ma first reported defendant's conduct to M.F.  The evidence further showed
21    that after July 21, 2002, when M.F. made the police report, she did not cooperate with the
police.  She did not bring Ma in for requested interviews with Detective Lucero, so after
22    several months the detective went to Ma's school to interview Ma in M.F.'s absence.  M.F.
also failed to bring Ma in for two scheduled physical examinations prior to the
23    examination that occurred on December 2, 2002.  Defense counsel also argued to the jury
that M.F.'s conduct showed that the reported lewd conduct did not occur.

24
25    The trial court also found that the requested evidence was not such as to render a
different result probable on retrial.  We agree with the trial court.  In addition to Ma's trial
26    testimony and her taped interview with Detective Lucero detailing the specifics of the two
separate incidents of lewd conduct, the jury heard testimony from both G. and S. stating
27    that Ma told them prior to M.F.'s police report that defendant had touched her.  Given this
evidence at trial supporting the conviction apart from M.F.'s testimony, defense counsel's
28    extensive cross-examination of M.F., and counsel's argument to the jury regarding M.F.'s
conduct, we find that the trial court acted within its discretion in determining that

1   defendant had not shown sufficient cause to warrant release of the subpoenaed phone
2   records.

Petn. Exh. A at 14-16.

3
4   **C.  Petitioner Cannot Demonstrate That Impeachment From The Phone Records
        Would Have Made A Favorable Difference At Trial**

5
6       If decipherable, at best, the phone records would show telephone calls made from
7   particular phone lines to a telephone petitioner had access to prior to Maile reporting the sexual
8   abuse to police.  The phone records would certainly not disclose the substance of conversations but
9   only the number of calls and possibly their duration.  Petitioner suggested that it was Melanie F. who
10  made those calls to himself, but without showing that Melanie F. used those various phone lines
11  exclusively, the phone records would be irrelevant.  Thus, counsels' various inactions have not been
12  shown to be prejudicial.  *Strickland v. Washington*, 466 U.S. at 691.

        At trial, petitioner testified that Melanie F. telephoned and asked him what she should do
13  with the subpena.  RT at 405-06.  Petitioner said that Melanie complained that she did not want to
14  drive to court and asked petitioner to dispose of the criminal case to keep from inconveniencing her
15  life. RT at 406-07.  Petitioner told Melanie to stop calling him.  RT at 407.  According to petitioner,
16  Melanie answered, "'Watch what I'll do.'"  RT at 407.

17      Melanie F. was impeached with convictions for misdemeanor petty theft, misdemeanor
18  embezzlement, and misdemeanor petty theft with a prior.  *See* Respondent's Exhibit D at 8-9.
19  Melanie F. testified that she did not know why she did not report the sexual abuse when Maile first
20  alerted her, or why she did not kick petitioner out of the house.  Exhibit D at 17.  Melanie F. testified
21  that she did not pursue the issue of possible sexual abuse until Maile complained of continued abuse
22  in July 2002.  Exhibit D at 25.  On cross-examination, trial counsel explored the reasons why four
23  months passed before investigating police officers had contact with Maile following Melanie F.'s
24  initial telephone report.  RT at 201-08.  On cross-examination, Melanie F. admitted that while the
25  family lived in Kelseyville, there were times when Maile and petitioner were home alone.  RT at
26  218-19.  Melanie F. admitted refusing police requests to record a phone conversation with petitioner
27  to obtain incriminating statements.  RT at  236.  Melanie F. admitted not telling investigating
28

officers that Maile had made earlier reports of abuse that Melanie F. ignored.  RT at 249.  Melanie F. denied arguing with petitioner about showing up to court and denied threatening him with the statement, "'Watch what I'll do.'"  RT at 249-50.

The record indeed demonstrates that Melanie F. was sufficiently impeached at trial. Defense counsel argued to the jury that Melanie F.'s acts were inconsistent with a truly concerned mother.  RT at 576.  Accordingly, defense counsel argued that there was no sexual abuse because the false reports were orchestrated by Melanie F.  RT at 562-83.  In response, the prosecutor invited the jury to "throw [Melanie F.'s] testimony out."  RT at 594.  The prosecutor argued that Melanie F. was "a woman who can't take care of herself, who doesn't do what she needs to do, who's had a tough time."  RT at 595.  The prosecutor argued that Maile remained credible, as did the other children who corroborated her reports of sexual abuse.  RT at 595-96.

As the trial court and California Court of Appeal found, further impeachment of Melanie F. with the phone records would have had no impact at trial.  Accordingly, petitioner does not demonstrate incompetent representation by trial counsel or by new counsel.  Petitioner does not demonstrate a reasonable probability of a different result had the phone records been available for impeachment at trial.  *Strickland,* 466 U.S. at 691.

The state courts' decision is not contrary to, nor does it involve an unreasonable application of *Strickland*.

## CONCLUSION

Accordingly, respondent respectfully requests that the Court deny the petition for writ of habeas corpus.

1    Dated:  December 26, 2007

2                          Respectfully submitted,

3                          EDMUND G. BROWN JR.
                           Attorney General of the State of California

4                          DANE R. GILLETTE
                           Chief Assistant Attorney General

5                          GERALD A. ENGLER
6                          Senior Assistant Attorney General

7                          JULIET B. HALEY
                           Deputy Attorney General

8

9                          /s/ *René A. Chacón*
10                         RENÉ A. CHACÓN
                           Supervising Deputy Attorney General

11                         Attorneys for Respondent

12   RAC:eaw

13   40198624.wpd
     SF2007402694

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3     INTRODUCTION .......................................................................................................... 1

4     STATEMENT OF THE CASE ...................................................................................... 2

5     LEGAL STANDARDS .................................................................................................. 2

6     STATEMENT OF FACTS ............................................................................................ 3

7            Prosecutor's Case In Chief ................................................................. 3

8     ARGUMENT ................................................................................................................. 5

9       **I.**      **PETITIONER'S DUE PROCESS CHALLENGE TO TRIAL COURT VENUE IS PROCEDURALLY DEFAULTED BY THE LACK OF A CONTEMPORANEOUS OBJECTION** ........................ 5

11      **II.**     **SUBSTANTIAL EVIDENCE SUPPORTS COUNT FOUR** .................. 7

12     **III.**    **PETITIONER DOES NOT ESTABLISH INEFFECTIVE ASSISTANCE OF COUNSEL** ........................................................... 13

13           A.    Factual Background ......................................................... 13

           B.    The California Court Of Appeal Findings Concerning The Trial Court's Refusal To Disclose The Phone Records ...................... 15

           C.    Petitioner Cannot Demonstrate That Impeachment From The Phone Records Would Have Made A Favorable Difference At Trial ... 17

CONCLUSION ............................................................................................................. 18

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

**Cases**

*Bennett v. Mueller*
322 F.3d 573 (9th Cir. 2003) ....................................................... 7

*Bruce v. Terhune*
376 F.3d 950 (9th Cir. 2004) ....................................................... 8

*Edwards v. Lamarque*
476 F.3d 1121 (9th Cir. 2007) (en banc) ..................................... 2

*Gray v. Netherland*
518 U.S. 152 (1996) ..................................................................... 7

*Harris v. Reed*
489 U.S. 255 (1989) ..................................................................... 7

*In re Winship*,
397 U.S. 358 (1970) ..................................................................... 8

*Jackson v. Virginia*
443 U.S. 307 (1979) ................................................................. 8, 12

*LaMere v. Slaughter*
458 F.3d 878 (9th Cir. 2006) ....................................................... 8

*Lockyer v. Andrade*
538 U.S. 63 (2003) ....................................................................... 2

*Payne v. Borg*
982 F.2d 335 (9th Cir. 1992) ....................................................... 8

*People v. Simon*
25 Cal.4th 1082 (Cal. 2001) ........................................................ 7

*Schlup v. Delo*
513 U.S. 298 (1995) ..................................................................... 7

*Strickland v. Washington*
466 U.S. 668 (1984) ............................................................ 13, 17, 18

*Walters v. Maass*
45 F.3d 1355 (9th Cir. 1995) ....................................................... 8

*Woodford v. Visciotti*
537 U.S. 19 (2002) (per curiam) ............................................... 2, 3

*Yarborough v. Gentry*
540 U.S. 1 (2003) (per curiam) .................................................. 13

**TABLE OF AUTHORITIES  (continued)**

**Page**

**Statutes**

28 U.S.C.
  § 2254                              1
  § 2254(d)(1)                        2

California Penal Code
  § 288(a)                        1, 2, 8
  § 667.5(b)                       2
  § 784.7                        5
  § 954                         7
  § 1203.066(a)(8)                   2

**Other Authorities**

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)      2, 13